FILED

2022 Mar-17  PM 12:50
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| JORDAN MANASCO, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No.: 2:21-cv-00381-JHE |
| | ) | |
| BEST IN TOWN, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Through their amended complaint, Plaintiffs Jordan Manasco ("Manasco"), Katrina Perez ("Perez"), Peyton Mastropolo, Stephanie Jeronymo ("Jeronymo"), Giddel Endaya Lynn ("Lynn"), Brittany Swan, and Kelsey Lucas (collectively, "Plaintiffs") bring this action against Defendants Best In Town, Inc. ("Best In Town"), Gregory L. Jackson and Graham G. Jackson, alleging violations of the Fair Labor Standards Act ("FLSA"). (Doc. 27).[1]  Plaintiffs have now moved to conditionally certify a class under the FLSA and issue notice to class members.  (Doc. 41). Defendants oppose that motion, (doc. 45), and Plaintiffs have filed a reply in support, (doc. 51). Additionally, Defendants have filed a motion seal a portion of their evidentiary material, (doc. 47), which Plaintiffs oppose, (doc. 50), and to which Defendants have filed a reply in support, (doc. 52).  For the reasons stated below, the motion for conditional class certification is **GRANTED IN PART** and **DENIED IN PART**, and the motion to seal is **GRANTED**.

---

[1] Manasco was the only plaintiff in the original complaint.  (Doc. 1). The remainder of the current plaintiffs have filed consents to "opt in" and join this action.  (*See* docs. 9, 13, 34, 36, 37 & 38).  Two former plaintiffs opted in, (docs. 9 & 13), but subsequently dismissed their claims. (Docs. 24, 39).

### I. Motion to Seal

The central issue in this case is whether Defendants complied with the FLSA in classifying and paying Plaintiffs.  Defendants are a club and its owners/operators, while Plaintiffs are exotic dancers.  As discussed further below, Plaintiffs are seeking to conditionally certify a class of similarly-situated plaintiffs, which would allow them to send notice of this action to other exotic dancers.

In their motion to seal, Defendants seek to redact the names of ten exotic dancers whose declarations they have offered in opposition to Plaintiffs' motion to conditionally certify a class.[2] (Doc. 47).  Defendants contend the declarants' privacy interests, along with the social stigma attached to the declarants' professions, warrants redacting the declarants' identities.  (Doc. 47 at 2).  Defendants have offered to provide Plaintiffs with unredacted declarations.  (*Id.* at 3).  In opposition, Plaintiffs contend that there is a legitimate risk that Defendants are coercing and intimidating exotic dancers, and thus that the public has an interest in their unredacted identities. (Doc. 50 at 3).  Plaintiffs have filed two declarations in support of their opposition which they argue supports coercive and intimidating behavior.  (*Id.* at 4-5; docs. 50-1 & 50-2).  In their reply, Defendants contend Plaintiffs' arguments are irrelevant to the legal standard at issue.  (Doc. 52).

Courts have long recognized the public's right to inspect judicial records and documents. *Stalnaker v. Novar Corp.*, 293 F. Supp. 2d 1260, 1263 (M.D. Ala. 2003) (noting the "common-law presumption that judicial records are public documents").  However, the Supreme Court has also recognized that the right of the public to access judicial information is not absolute. *See Nixon*

---

[2] Specifically, Defendants seek to redact the names of the declarants in docs. 46-2 through 46-11.

*v. Warner Communications*, 435 U.S. 589, 598 (1978). In exercising its discretion to seal judicial records, the court must balance the public's common law right of access against the interests favoring nondisclosure. *See Nixon*, at 602. The decision of public access is left up to the trial court. *Id*. at 599. A federal court's authority to seal or otherwise prevent public access to documents or proceedings is derived from Rule 26(c) of the Federal Rules of Civil Procedure. *See* FED. R. CIV. P. 26(c); *In re Estate of Martin Luther King, Jr., Inc., v. CBS, Inc.,* 184 F. Supp. 2d 1353, 1362 (N.D. Ga. 2002). The presumption of public access may be overcome if the moving party shows good cause. *Romero v. Drummond Co.*, 480 F.3d 1234, 1246 (11th Cir. 2007). "In balancing the public interest in accessing court documents against a party's interest in keeping the information confidential, courts consider, among other factors, whether allowing access would impair court functions or harm legitimate privacy interests, the degree of and likelihood of injury if made public, the reliability of the information, whether there will be an opportunity to respond to the information, whether the information concerns public officials or public concerns, and the availability of a less onerous alternative to sealing the documents." *Id*. (citations omitted).

As noted above, Defendants offer two intertwined reasons for keeping their declarants publicly anonymous: privacy and social stigma. Each of the declarations backs up the declarant's privacy concerns. For example, Jane Doe #1's declaration states:

> When I perform as a professional entertainer, I usually perform under the stage name [REDACTED]. I use this stage name to protect my personal privacy. Because I am performing adult-oriented entertainment, privacy is very important to me. I do not wish to have my name provided to Plaintiffs, their lawyers, or anyone else because of my privacy concerns. I do not want any types of notices mailed to my home, emailed to me or texted to me where other people may see them. Rather, I want it to be my sole choice to decide to whom I disclose the fact that I am a professional entertainer, and I do not want my ability to make that choice compromised by Plaintiffs, their lawyers, the Court, or anyone else.

(Doc. 46-2 at 13).   Similar language appears in each of the other declarations.   Notably, Defendants' request is narrower than the declarants' stated wishes.   Under their proposed framework, Plaintiffs and their lawyers would receive the names of the declarants; they would just be omitted from the public record.

Although Defendants list them separately, unadorned concerns over "privacy" and "social stigma" are different ways of stating that the disclosure of the declarants' identities would open them up to public embarrassment.   The Eleventh Circuit has held that, standing alone, the prospect of personal embarrassment is not enough to permit a party to proceed anonymously.   *Doe v. Sheely*, 781 F. App'x 972, 974 (11th Cir. 2019) (citing *Doe v. Frank*, 951 F.2d 320, 322 (11th Cir. 1992)). Defendants' citation to case law from courts in the Ninth Circuit is at odds with the law in this Circuit; the standard in the Ninth Circuit specifically *does* allow for pseudonymity based on personal embarrassment.   *See Jane Roes 1-2 v. SFBSC Mgmt., LLC*, 77 F. Supp. 3d 990, 993 (N.D. Cal. 2015) (quoting *See Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1067–68 (9th Cir. 2000)) ("In this circuit, we allow parties to use pseudonyms in the 'unusual case' when nondisclosure of the party's identity 'is necessary . . . to protect a person from harassment, injury, ridicule or personal embarrassment.'").   Additionally, another of the cases Defendants cite, *Doe v. Cin-Lan, Inc.*, 2008 WL 4960169 (E.D. Mich. Aug. 4, 2008), *report and recommendation rejected on other grounds,* 2008 WL 4960170 (E.D. Mich. Nov. 20, 2008), is a report and recommendation on a motion for a temporary restraining order which offers no actual analysis of whether the exotic dancer plaintiff should be permitted to proceed anonymously; instead, it simply excerpts a portion of the plaintiff's complaint.   *Cin-Lan*, 2008 WL 4960169 at *1 n.1.   In the remaining case, *Doe #1 v. Déjà Vu Consulting Inc.*, the plaintiff asserted more than simply the embarrassment of having her identity disclosed; she also alleged her parents were "devoutly religious members of a Christian

4

church and that, in light of their involvement in the Church and the public's tendency to equate nude dancing (which is legal) with prostitution (which is not), she fears that her public identification as an adult entertainer "would invite criticism and negativity" toward herself and her family, as well as the possibility of confrontation, harassment, and invasion of privacy." 2017 WL 3837730 (M.D. Tenn. Sept. 1, 2017) at *4. Consequently, the court found "the social stigmatization that the plaintiff could face goes beyond allegations of mere embarrassment." *Id.* More helpfully to Defendants, the court also found "the mere fact that a plaintiff self-identifies as an exotic or nude dancer, *per se*, may place her at risk of harassment and stalking, including cyberstalking." *Id.*

All that said, as Defendants note in their reply, (doc. 52 at 2), the cases above deal with a *party's* ability to proceed anonymously, not whether a declarant witness may submit a declaration anonymously based on allegations of social stigma. The public's interest in knowing who is prosecuting or defending a civil suit is substantially greater than its interest in knowing the identity of a witness. For example, Federal Rule of Civil Procedure 10(a) requires a complaint to "name all the parties." FED. R. CIV. P. 10(a). "This rule serves more than administrative convenience. It protects the public's legitimate interest in knowing all of the facts involved, including the identities of the parties." *Frank*, 951 F.2d at 322. While the identities of witnesses are part of the "facts involved" in the case, they are considerably more peripheral than the identities of the litigants, and there is no Rule of Civil Procedure that compels their disclosure; instead, it is only the common-law presumption of openness Defendants need to overcome. Accordingly, whether or not the declarants assert public embarrassment alone is not the end of the inquiry into whether they should be permitted to proceed anonymously.

5

Balancing the *Romero* factors, the undersigned finds the declarants' interests in privacy outweigh the public's interest in disclosure of their names.  First, as to whether "allowing access would impair court functions or harm legitimate privacy interests," there is no real risk that allowing anonymity would impair court functions, but there is a risk that it would harm legitimate privacy interests.  The undersigned agrees that some social stigma would attach if the declarants' names were revealed, whether or not that rises above mere personal embarrassment.  Consequently, this factor weighs in favor of anonymity.  As to the second factor, the "degree of and likelihood of injury" if the declarants' names were made public, the undersigned finds that the potential for harassment and stalking identified by the court in *Déjà Vu Consulting* is present here, even if there has been no showing that it is particularly likely to occur.  Thus, this factor also weighs—weakly—in favor of anonymity.  Any concerns relating to the third and fourth factors, "the reliability of the information" and "whether there will be an opportunity to respond to the information," can be solved by Defendants' proposed remedy of supplying the names of the anonymous declarants to Plaintiffs.  These factors are neutral at most.  The fifth factor, "whether the information concerns public officials or public concerns," is not implicated here.  And the final factor, "the availability of a less onerous alternative to sealing the documents," is not strictly on point because Defendants are already advocating a less onerous remedy than sealing the declarations: filing them with names redacted.

Countering this, Plaintiffs argue there are "legitimate concerns that the individual defendants are intimidating their dancers and preventing them from asserting their rights under the FLSA."  (Doc. 50 at 4).  Plaintiffs offer the declaration of Plaintiff Giddel Endaya Lynn, in which Lynn states she informed the club that she could not work on December 31, 2019, due to a shoulder injury, and received a response from Defendant Graham Jackson indicating she was expected to

6

be there anyway and would not be permitted to return to the club if she did not show.  (Doc. 50 at 4-5) (citing doc. 50-2 at ¶¶ 3-7).  Plaintiffs also cite an incident in which Graham Jackson fined Plaintiff Jordan Manasco and another dancer for complaining about a customer who exposed his genitalia to them.  (Doc. 50 at 5).  Finally, Plaintiffs refer to the declaration of Plaintiff Stephanie Jeronymo and a video exhibit they previously filed supporting that Defendant Greg Jackson inappropriately touched dancers.  (*Id.* at 5) (citing doc. 50-1 at ¶¶ 4-6).  However, these incidents have no apparent relationship to whether or not the declarants' identities should be publicly disclosed beyond Plaintiffs conclusory statements.  To the extent Plaintiffs argue Greg and Graham Jackson have intimidated exotic dancers, there is no bar to them exploring this theory in discovery; Plaintiffs will have the names of the declarants.

Defendants' motion is due to be granted.  The parties are directed to confer on a joint protective order per the instructions set out in the conclusion below.

## II. Factual and Procedural Background

According to the amended complaint and subsequent opt-in notices, Plaintiffs were all employed by Defendants as exotic dancers at a club called The Furnace.  (Doc. 27 at ¶¶ 9, 11-13; docs. 34, 36, 37 & 38).  Defendant Best In Town does business as The Furnace, Defendant Gregory L. Jackson is the president and co-owner of Best In Town, and Defendant Graham G. Jackson is co-owner and general manager of Best In Town; each is alleged to be an employer of Plaintiffs. (*Id.* at ¶¶ 14-18).  Plaintiffs allege Defendants unlawfully categorized them as independent contractors, resulting in various FLSA violations.  (*Id.* at ¶¶ 106-138).

Plaintiffs have submitted declarations from three exotic dancers at The Furnace, all of whom are current Plaintiffs in this action.  Plaintiff Jordan Manasco testifies she was not paid hourly, but instead retained a portion of dance fees and tips.  (Doc. 41-10 at ¶ 6).  Manasco states

she was forced to pay Defendants an average of $40 to $60 in "house fees" per shift, and at least
$35 per shift in forced tips to other employees.  (*Id.* at ¶ 7).  Manasco declares she was forced to
pay late fees of between $25 and $150 when she failed to arrive for a shift at a designated time.
(*Id.* at ¶ 8).  Upon information and belief, Manasco states other dancers did not receive wages.  (*Id.*
at ¶ 9).  She offers the following as to other dancers:

> 10. Defendants have misclassified me and all other exotic dancers/entertainers at
> The Furnace as independent contractors.

> 11. Defendants engaged in the common practice of treating me and all other exotic
> dancers/entertainers at The Furnace as independent contractors, depriving us of
> wages, and enforcing mandatory tipping to the club.

> 12. Defendants dictated to me and all other exotic dancers/entertainers at The
> Furnace how dancers performed their work, setting prices that customers would be
> charged per dance, setting fee splits, tip policies and house fee policies, and
> controlling when and how dancers performed.

> 13. Defendants controlled the dance prices and set the price floor for lap dances at
> a minimum of $20 per dance.

> 14. Defendants also set the prices charged to customers for VIP dances. Defendants
> set the VIP dance price at approximately $150 for 15 minutes, with the club
> pocketing $50 and the dancer keeping $100.

> 15. Defendants also charged a fee to dancers/entertainers of roughly $10 to $30 for
> every VIP dance they performed.

> 16. Defendants also required dancers/entertainers to accept The Furnace's artificial
> in-house currency, "Furnace Bucks," as payment for dances. Dancers/entertainers
> were charged a 10% fee to convert Furnace Bucks into cash.

> 17. Defendants charged all dancers/entertainers a "house fee" for the ability to work
> a particular shift.

> 18. Defendants charged all dancers/entertainers a late fee if they failed to arrive to
> a particular shift at the designated time.

> 19. Defendants would regularly keep The Furnace open beyond its regular business
> hours for high-paying customers and would retain 10% of all monies earned by
> dancers during these "after-hours."

8

20. All dancers/entertainers were required to commit to a work schedule with the house mom one week in advance.

21. Defendants required all dancers/entertainers to attend bi-annual/quarterly status meetings. Dancers/entertainers were not paid for their time spent in attendance at the meetings.

22. All dancers/entertainers were expected to tip out other employees including DJs, house moms, and managers. Management expected all dancers/entertainers to tip out other employees. If a dancer/entertainer failed to tip out other employees working that night, management would retaliate against them.

23. Defendants also exercised a great deal of control over how I and all other dancer entertainers performed.

24. Dancers/entertainers were required to complete their entire shift for any particular day they showed up to work.

25. All dancers/entertainers were required to ask for permission to leave early during a shift.

26. Defendants exercised control over whether dancers/entertainers including myself were allowed to dance at the club, refusing to let a dancer/entertainer work a shift for any reason.

27. I am aware that other exotic dancers/entertainers fear retaliation for voicing concern over Defendants' FLSA violations and for opting-in as plaintiffs for this lawsuit.

28. I am aware that other similarly situated exotic dancers/entertainers who are/were employees of Defendants and are interested in joining this lawsuit and desire to opt-in as plaintiffs. These exotic dancers/entertainers are similarly situated with regards to job performance, duties and requirements and are subject to the same pay policies that were implemented by Defendants, as stated above.

(Doc. 41-10 at ¶¶ 10-28).  Plaintiffs Katrina Perez and Stephanie Jeronymo have also offered

declarations.  (Docs. 41-11 and 41-12).  These declarations are nearly identical to Manasco's.

(*Compare* doc. 41-10 at ¶¶ 5-28 *with* doc. 41-11 at ¶¶ 5-28 *and* doc. 41-12 at ¶¶ 6-30).[3]

_____

[3] There are some differences in the declarations.  Manasco states the late fee for failing to arrive on time ranged from $25-$150, (doc. 41-10 at ¶ 8), while Perez indicates the late fees she

In opposition, Defendants have submitted a declaration from Jennifer Sartain ("Sartain," The Furnace's current office manager) and ten identical anonymous declarations from other exotic dancers at The Furnace.  (Docs. 46-1 through 46-11).  Sartain disputes nearly all of the allegations by Manasco, Perez, and Jeronymo.  (*See generally* doc. 46-1).  The anonymous exotic dancers generally echo these sentiments.  (*See generally* docs. 46-2 through 46-11).

### III. Analysis

### A. Plaintiffs' Showing of Others Similarly Situated and a Desire to Opt-In

Section 216(b) of the FLSA authorizes action for unpaid overtime compensation against any employer "by any one or more employees for and in behalf of himself or themselves and other employees similarly situated."  29 U.S.C. § 216(b).  Thus, to maintain a collective action under the FLSA, plaintiffs must demonstrate that they are "similarly situated."  *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1258 (11th Cir. 2008).  Further, would-be plaintiffs in a § 216(b) collective action must affirmatively "opt-in" to the suit.  29 U.S.C. § 216(b) ("No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.").  In this way, § 216(b) collective actions differ from Federal Rule of Civil Procedure 23 class actions because under Rule

---

was charged "ranged from $20 to $100," (doc. 41-11 at ¶ 8), and Jeronymo says the late fee was "a maximum of $120," (doc. 41-12 at ¶ 9).  Additionally, where Manasco and Perez state "Defendants also charged a fee to dancers/entertainers of roughly $10 to $20 for every VIP dance they performed," (doc. 41-10 at ¶ 15; doc. 41-11 at ¶ 15), Jeronymo puts this amount at "roughly $10 to $30," (doc. 41-12 at ¶ 16).  Finally, Jeronymo includes a paragraph indicating Defendants charged dancers $40-$100 when they missed a shift.  (*Id.* at ¶ 20).

23, a person must affirmatively "opt out" if he or she wishes to abstain from the lawsuit.  *See Hipp v. Liberty Nat'l Ins. Co.*, 252 F.3d 1208, 1216 (11th Cir. 2001).[4]  In the § 216(b) context, "once a plaintiff files a complaint against an employer, any other similarly situated employees who wants to join must affirmatively consent to be a party and file written consent with the court."  *Morgan*, 551 F.3d at 1259.  The FLSA does not provide specific procedures by which potential plaintiffs may opt-in, but the Supreme Court has held that "district courts have discretion, in appropriate cases, to implement 29 U.S.C. §216(b) . . . by facilitating notice to potential plaintiffs."  *Hoffman-La Roche, Inc. v. Sperling*, 493 U.S. 165, 169 (1989); *see also Haynes v. Singer Co.*, 696 F.2d 884, 886 (11th Cir. 1983).  Describing the practical benefits of FLSA collective actions, the Supreme Court has stated as follows:

> A collective action allows . . . plaintiffs the advantage of lower individual costs to vindicate rights by the pooling of resources.  The judicial system benefits by efficient resolution of one proceeding of common issues of law and fact arising from the same alleged discriminatory activity.  These benefits, however, depend on employees receiving accurate and timely notice concerning the pendency of the collective action, so that they can make informed decisions about whether to participate.

*Hoffman-La Roche, Inc.*, 493 U.S. at 170.

The Eleventh Circuit has suggested a two-tiered process for district courts to manage collective actions.  *Hipp*, 252 F.3d at 1218-19.[5]  At the first stage, called conditional certification

---

[4] Although *Hipp* addresses a collective action brought under the Age Discrimination in Employment Act, the same analysis applies to collective actions under the FLSA.  *Cameron-Grant v. Maxim Healthcare Servs., Inc.*, 347 F.3d 1240, 1243 n.2 (11th Cir. 2003).

[5] Defendants spend a significant portion of their opposition urging the court to reject the two-step process identified in *Hipp* and instead embrace a standard recently adopted by the Fifth Circuit in *Swales v. KLLM Transp. Servs., L.L.C.*, 985 F.3d 430 (5th Cir. 2021).  (Doc. 45 at 2-10).  In *Swales*, the Fifth Circuit found that the two-step process "frustrates, rather than facilitates, the notice process" because it is an "amorphous and ad-hoc test [which] provides little help in

or the "notice" stage, the district court makes a determination, based on the pleadings and affidavits

on file, of whether it should authorize notice of the action to potential class members. *Id.* at 1218.

Because the court has minimal evidence, the standard is lenient. *Id.* The district court must merely

be satisfied that there are other employees who wish to opt-in, and that they are similarly situated

to the original plaintiff "with respect to their job requirements and with regard to their pay

provisions." *Morgan*, 551 F.3d at 1259 (quoting *Dybach v. Fla Dept. of Corrs.*, 942 F.2d 1562,

1567-68 (11th Cir. 1991)). Indeed, this inquiry "typically results in 'conditional certification' of

a representative class." *Hipp*, 252 F.2d at 1218. If the court conditionally certifies a class, court-

supervised notice of the pendency of the action is then given to the potential class members, and

they are afforded an opportunity to opt-in to the action. *Id.*

---

guiding district courts in their notice-sending authority." 985 F.3d at 439-40. Instead, it held "district court should identify, at the outset of the case, what facts and legal considerations will be material to determining whether a group of 'employees' is 'similarly situated.' And then it should authorize preliminary discovery accordingly." *Id.* at 441. In the *Swales* court's view, this would allow the court to better determine at a later point which plaintiffs are appropriately part of the collective action (or whether the case should proceed on a collective basis at all). *Id.* at 442-43.

It is true that the process identified in *Hipp* is not binding on the court. That said, very few district courts outside the Fifth Circuit have chosen to follow *Swales*, and no other circuit court has adopted its reasoning. One district court has considered and rejected *Swales'* application in this circuit. *Wright v. Waste Pro USA, Inc.*, No. 0:19-CV-62051-KMM, 2021 WL 1290299, at *2 (S.D. Fla. Apr. 6, 2021). The undersigned acknowledges that another court in this circuit—in fact, one in this district—has noted that "district courts in the Eleventh Circuit are not bound to follow the *Hipp* two-step certification process" and found *Swales* to be helpful because it "promotes efficiency by ensuring that the time and expense inherent in the distribution of notice is warranted." *Broome, et al., v. CRST Malone, Inc.*, No. 2:19-CV-01917-MHH, 2022 WL 205675, at *4 (N.D. Ala. Jan. 21, 2022). That said, while the historical use of the two-step process within this circuit is not dispositive of the issue and not specifically *required* by *Hipp*, the undersigned has found the process to be much more effective than the *Swale* court implies. That practical experience trumps the hypothetical efficiency offered by *Swale*. As Defendants note, (doc. 45 at 9), the Eleventh Circuit has left this issue to the discretion of the district courts. Therefore, the undersigned will exercise that discretion and use the two-step conditional certification process.

12

The second stage of the process is activated by the defendant filing a decertification motion following the completion of discovery. *Id.* At this stage, based on a fully-developed record, the court makes a determination of whether the named plaintiffs and the opt-ins are similarly situated. *Id.* The plaintiff has a heavier burden to show similarity at the second stage than at the first stage. *Morgan*, 551 F.3d at 1261. If the court finds the plaintiffs are not similarly situated, it decertifies the action, dismisses the opt-in plaintiffs without prejudice, and the named plaintiffs proceed to trial on their individual overtime claims. *Hipp*, 252 F.3d at 1218. At all times, the decision to create an opt-in class under section § 216(b) "remains soundly within the discretion of the district court." *Id.* at 1219.

Plaintiffs are currently at the first step, seeking initial conditional certification of the class and judicial approval of a proposed notice of potential members. As such, Plaintiffs' burden at this stage hinges on their ability to show that they and the prospective opt-in plaintiffs are "similarly situated." *Morgan*, 551 F.3d at 1259 (citations omitted). The FLSA does not define "similarly situated," *see* 29 U.S.C. § 216(b), and while the Eleventh Circuit has declined to adopt a precise definition for the term, *see Morgan*, 551 F.3d at 1259, it has provided some guidance. It is clear that to maintain an FLSA collection action, the named plaintiff or plaintiffs "need only show that their positions are similar, not identical, to the positions held by the putative class members." *Grayson v. K-Mart*, 79 F.3d 1086, 1096 (11th Cir. 1996). Yet, the "similarities necessary to maintain a collective action under § 216(b) must extend 'beyond the mere facts of job duties and pay provisions.'" *Anderson v. Cagle's, Inc.*, 488 F.3d 945, 953 (11th Cir. 2007). "Otherwise, 'it is doubtful that § 216(b) would further the interests of judicial economy, and it would undoubtedly present a ready opportunity for abuse.'" *Id.* (citations omitted). Essentially, a plaintiff must demonstrate a "reasonable basis" for his claim of class-wide discrimination.

*Grayson*, 79 F.3d at 1097.  This burden, "which is not heavy, [is met] by making substantial allegations of class-wide discrimination, that is, detailed allegations supported by affidavits which successfully engage defendants' affidavits to the contrary."  *Id.* (citation omitted); *see also Morgan*, 551 F.3d at 1261 ("The district court's broad discretion at the notice stage is thus constrained, to some extent, by the leniency of the standard for the exercise of that discretion. Nonetheless, there must be more than 'only counsel's unsupported assertions that FLSA violations [are] widespread and that additional plaintiffs would come from other stores.'" (citation omitted)).

Here, Plaintiffs have offered allegations and evidence sufficient to meet their light burden. Plaintiffs have offered three declarations with identical allegations regarding the degree of control Defendants exercised over each of them, including, *inter alia*, controlling hours and shifts, setting the rates each dancer could earn, setting tip policies, and requiring dancers to accept "Furnace Bucks" in lieu of other payments.  As Plaintiffs note, courts confronted with broadly similar allegations have found exotic dancers to be employees.  (*See* doc. 41-1 at 8-9) (citing, *e.g.*, *Schofield v. Gold Club Tampa, Inc.*, No. 8:19-CV-3097-VMC-TGW, 2021 WL 533540, at *2 (M.D. Fla. Feb. 12, 2021); *Mason v. Fantasy, LLC*, No. 13–CV–02020–RM–KLM, 2015 WL 4512327, at *13 (D. Colo. July 27, 2015); *Henderson v. 1400 Northside Drive, Inc*., No. 1:13–CV–3767–TWT, 2015 WL 3823995, at *5 (N.D. Ga. June 19, 2015)).  Furthermore, apart from asserting the court should use a different standard to measure the adequacy of Plaintiffs' evidence, (*see* doc. 45 at 9-10), Defendants do not appear to contest (for the purposes of this motion, at least) Plaintiffs' factual showing would support their right to relief under the FLSA.  As previously stated, *see supra*, n.5,  the undersigned finds Defendants' proposed standard inapt, so the undersigned will also not delve too deep into what is essentially a swearing match between Plaintiffs, who contend and offer evidence to support that The Furnace exercised a degree of

14

control over them sufficient to support they and other exotic dancers were misclassified as independent contractors, and Defendants, who contend and offer contrary evidence that exotic dancers were appropriately classified as independent contractors.  If Defendants' evidence is believed, there are no persons at all—including Plaintiffs—similarly situated to the position Plaintiffs describe.  The undersigned will not resolve the parties' factual dispute as to the ultimate merits of the case at this stage, but instead concludes only that Plaintiffs have demonstrated a "reasonable basis" for determining other potential plaintiffs are "similarly situated" to them in performing the duties of the position as they have described it. *See Grayson*, 79 F.3d at 1097.

Plaintiffs have also successfully met their burden to show that others desire to "opt in." Not counting the opt-in plaintiffs who subsequently opted out, six additional plaintiffs have opted in since this case was filed.  (Docs. 9, 13, 34, 36, 37 & 38).   Defendants argue Plaintiffs have failed to discharge this burden by failing to identify any specific individual who wants to opt in, (doc. 45 at 10-13), but they ignore the fact that eight members of the proposed class (of which six remain) have already opted in.  As Plaintiffs state in their reply, it would make little sense for the court to conclude that Plaintiffs could demonstrate class-wide interest in joining the lawsuit only by identifying plaintiffs who wished to opt in, but refusing to allow them to opt in pending conditional certification.[6]  There is sufficient evidence in this case to show class-wide interest in joining this lawsuit because numerous members of that class have already joined. *See, e.g., Tyler v. Payless Shoe Source, Inc.*, 2005 WL 3133763, at *1 (M.D. Ala. Nov. 23, 2005) (finding three to five opt-in plaintiffs provided evidence that others desired to join the suit); *Lemming v. Sec.*

---

[6] Defendants note Plaintiffs have advertised this action on social media, (doc. 45 at 12), but it is not clear why this would impact the court's analysis.

*Forces, Inc.*, No. 8:10-CV-1469-T-23AEP, 2010 WL 5058532, at *1 (M.D. Fla. Dec. 6, 2010) ("The number of plaintiffs necessary to demonstrate a desire to opt in is not many, sometimes as few as two, three, or four."). For that reason, the case law Defendants cite, all of which concerns vague statements of belief that others might want to join or a limited number of opt-ins since filing, is inapposite. *See, e.g., Mackenzie v. Kindred Hosps. E., L.L.C.*, 276 F. Supp. 2d 1211, 1221 (M.D. Fla. 2003) (only one plaintiff, no evidence of other interested parties); *Barten v. KTK & Assocs., Inc.*, No. 8:06-CV-1574T27EAJ, 2007 WL 2176203, at *3 (M.D. Fla. July 26, 2007) (plaintiffs had identified "only one viable opt-in plaintiff" since the lawsuit was commenced). Under these circumstances, it is immaterial that Plaintiffs have not identified specific other members of the class who have not yet opted in or submitted an affidavit from a potential plaintiff.

Since Plaintiffs have shown there are similarly situated employees who wish to opt in, their motion for conditional certification is due to be granted.

### B. Form of Notice to Putative Class Members

Plaintiffs have proposed a notice to send to potential class members, along with a consent form. (Docs. 41-2 & 41-3). Plaintiffs seek to mail, email, and text the notice to all dancers at The Furnace. (Doc. 41-1 at 17). Defendants contest numerous aspects of the form and content of notice, as well as Plaintiffs' proposed method of conveying it to potential class members. (Doc. 45 at 13-23). Each of those objections is considered below.[7]

---

[7] Defendants also request the parties be required to meet and confer on a mutually agreeable form of notice prior to the court resolving the issue, with each side being permitted an opportunity to object to the others' proposed form. (*Id.* at 15). As to the last of these, Defendants' opposition to particular aspects of the notice is clear from their brief and seems unlikely to be resolved by discussion with Plaintiffs. Furthermore, Plaintiffs state they have already attempted to meet and confer with Defendants with respect to the motion itself. (Doc. 51 at 7). Thus, the undersigned

### 1. Lookback Period

Plaintiffs' proposed notice includes a "lookback" period of three years.  (Doc. 41-2 at 2).
Defendants contend this should be limited to two years from the notice's mailing date.  (Doc. 45
at 15-19).

"Under the FLSA, there is a two-year statute of limitations, unless an employer's violations
are deemed 'willful,' in which case there is a three-year statute of limitations." 29 U.S.C. § 255(a).
"A violation is 'willful' if the employer knew or showed reckless disregard for the matter of
whether its conduct was prohibited by the FLSA. The showing needed for a finding of 'willful' is
demanding in that even if an employer acted unreasonably, if the employer's action was not
reckless in determining its legal obligations under the FLSA, such action is not 'willful.'" *Powell
v. Carey Intern, Inc.*, 483 F. Supp. 2d 1168, 1176 (S.D. Fla. 2007).

Defendants argue Plaintiffs have failed to provide any evidence of willfulness, so Plaintiffs
should not get the benefit of the three-year statute of limitations in the face of other evidence of
Defendants' efforts to comply with the FLSA.  (Doc. 45 at 16-17).  It is true Plaintiffs have the
ultimate burden to show a willful violation and thereby trigger the three-year limitations period.
*See Rodriquez v. Farm Stores Grocery, Inc.*, 518 F.3d 1259, 1274 (11th Cir. 2008).  However, the
amended complaint alleges willful violations of the FLSA.  (*See* doc. 12 at ¶¶ 3, 74, 110, 130-31).
Defendants provide no authority that Plaintiffs are required to meet their burden to prove this at
the conditional certification stage, or to rebut Defendants' evidentiary showing.  *See Simpkins v.
Pulte Home Corp.*, No. 608-CV-130-ORL-19DAB, 2008 WL 3927275, at *9 (M.D. Fla. Aug. 21,

will not require the parties to further meet and confer before resolving Defendants' objections.
consistent with this memorandum opinion and the accompanying order.

2008) (refusing to determine whether a violation was willful on conditional certification because of the "fact determinative" nature of the inquiry).  Defendants are free to litigate the willfulness issue at an appropriate point in the future, such as at the decertification stage.

Defendants' other issue with the lookback period is whether the date should flow from the date of the notice or from the date the complaint was filed.  (Doc. 45 at 17-18).  Defendants argue the notice should reflect a lookback period from the date the notice is sent, contending Plaintiffs' proposed notice "would result in notice being sent to numerous employees who worked for Defendant during a period which exceeds the longest applicable statute of limitations for FLSA claims." (*Id.* at 17).

Defendants' position is consistent with the statutory requirements:

In determining when an action is commenced for the purposes of section 255 of this title . . . in the case of a collective or class action instituted under the Fair Labor Standards Act . . . it shall be considered to be commenced in the case of any individual claimant—

(a) on the date when the complaint is filed, if he is specifically named as a party plaintiff in the complaint and his written consent to become a party plaintiff is filed on such date in the court in which the action is brought; or

(b) if such written consent was not so filed or if his name did not so appear—on the subsequent date on which such written consent is filed in the court in which the action was commenced.

29 U.S.C. § 256.  "Under the plain terms of this statute, if the written consent of an opt-in plaintiff is not filed within three years from their last pay date, their action is barred."  *Gutescu v. Carey Int'l, Inc.*, 2003 WL 25586749, at *17 (S.D. Fla. July 21, 2003).

Plaintiffs' only rebuttal to this is to cite orders from other courts that have issued notice three years predating the complaint.  (Doc. 51 at 7-8).  Regardless of this, the statute itself suggests Defendants have the better proposal.  *See, e.g., Simpkins*, 2008 WL 3927275, at *9 n.9 (setting

relevant period at three years from the date the notice letter is mailed "[b]ecause the statute of limitations runs until the written opt-in notice is filed with the Court" under § 256). Consequently, the notice may include a three-year period, but must indicate the relevant three-year period is the three years prior to the date of the notice itself.

### 2. Dissemination of Notice and Opt-In Period

As noted above, Plaintiffs seek to disseminate the notice to potential class members by mail, email, and text message. (Doc. 41-1 at 18-19). Plaintiffs also request the notice be posted on The Furnace's website and on its premises "adjacent to the entrance door for any dancer." (*Id.* at 19). Plaintiffs seek to hold the notice period open for 60 days and to send a reminder within 30 days of the notice mailing. (*Id.* at 19-20). Defendants object to notice by text message, to posting the notice at their premises and on their website, and to a reminder notice. (Doc. 45 at 19-21). Defendants request any notice period be restricted to 45 days, rather than 60. (*Id.* at 20-21).

First, notification by text message will not be permitted at this stage. The parties each offer cases where a court permitted (Plaintiffs' authority) or denied (Defendants' authority) a request to disseminate notices by text message. (*See* doc. 41-1 at 19-20; doc. 45 at 19; doc. 51 at 8-9). To this, Plaintiffs add a declaration from attorney John P. Kristensen, who states that in the majority of cases like this one, "the dancers' addresses on file are often out of date and do not provide adequate notice," but text messages result in responses from a much greater percentage of putative class members. (Doc. 51-1 at 2). The undersigned is persuaded by the reasoning of another judge of this district confronted with a similar request for text message notification:

> The court sides with [the defendant] at this juncture because it has no basis yet to find that the traditional method of notice will not reach the prospective class members. For those prospective class members whose notice the Post Office returns, the court will consider email communication as an alternative means to reach them. Although the court will not fully foreclose it yet, the court has serious

> reservations about sanctioning text messages as a way to reach the potential class. As counsel for [the plaintiff] know, some individuals have limited phone plans, and unwarranted text messages may cause these individuals to incur monetary charges. Moreover, sending potential class members text messages will subject them to the annoyance of unsolicited messages that Congress passed the Telephone Consumer Protection Act, in part, to address.

*Miller v. JAH, LLC*, 2018 WL 305819, at *3 (N.D. Ala. Jan. 5, 2018).  Because Defendants do not oppose notice by email,[8] the undersigned will adopt this reasoning only to the extent that it applies to text messages.  Plaintiffs may seek approval for notice by text message if it appears that the other two methods of communication are inadequate to reach class members.

As to posting notice at The Furnace and on The Furnace's website, the undersigned also sides with Defendants.  Courts have generally required that "Class Notice be posted at the workplace only after a showing that a defendant has failed to cooperate in the collective action process." *Gonzalez v. TZ Ins. Sols., LLC*, No. 8:13-CV-2098-T-33EAJ, 2014 WL 1248154, at *6 (M.D. Fla. Mar. 26, 2014).  *See also Green v. Grand Villa of St. Petersburg*, No. 8:15-CV-1973-T-30, 2015 WL 7777537, at *4 (M.D. Fla. Dec. 3, 2015).  Although Plaintiffs' have alleged the bad behavior by the Jacksons detailed in their response to the motion to seal, (*see* doc. 51), none of the incidents they describe relate to the certification process itself (for example, failing to provide adequate lists of potential class members, *Sutton v. Premium Car Wash*, No. 6:12-CV-1254-ORL-28, 2013 WL 2474416, at *4 n.3 (M.D. Fla. June 10, 2013)).  Because Plaintiffs have

---

[8] Defendants state notice "should only be sent to personal email addresses" of putative class members, but then indicate "[t]here is no reason why clear written notice sent to an individual's *home address* and personal email is not a sufficient means of notifying the individual of the case and the opportunity to join."  (Doc. 45 at 19).  The undersigned interprets this as an objection to anything beyond sending notices by mail and email.

not demonstrated anything that would support the notice they request, Defendants will not be required to post notice of the action on The Furnace's premises or website.

Similarly, Plaintiffs have shown no need for a reminder notice. Without circumstances indicating their need, courts have found reminder notices "unnecessary and redundant." *See Dean v. W. Aviation, LLC*, No. 17-CV-62282, 2018 WL 1083497, at *6 (S.D. Fla. Feb. 28, 2018); *Green*, 2015 WL 7777537, at *4. Plaintiffs do not address Defendants' opposition to reminder notices in their reply, and the undersigned sees no reason for them here absent any indication one notice will be insufficient.

Finally, the undersigned agrees with Plaintiffs that 60 days is a reasonable opt-in period. Defendants' opposition to this seems to be that they would prefer a 45-day period. (*See* doc. 45 at 20-21). They have cited no authority and make no argument to support a 60-day period is inappropriate, either on its face or in terms of the putative class here. Thus, the undersigned will permit the period Plaintiffs seek.

### 3. Defense Counsel's Name and Contact Information

Defendants contend their counsel's name and contact information should be required in the notice. (Doc. 45 at 21). Their rationale is "full disclosure to recipients," which is essentially the same rationale offered in both cases they cite. (*Id.*) (citing *Pares v. Kendall Lakes Auto., L.L.C.*, 2013 WL 3279803, at *10 (S.D. Fla. June 26, 2013); *Gonzalez*, 2014 WL 1248154, at *5). Neither court explained its rationale, and in fact the request seemed to be unopposed in *Pares*. Although the undersigned has approved notices that include this information in the past when the parties substantially agreed on a form of notice, Defendants offer no reason to conclude the proposed notice is inadequate for failing to include it. Therefore, the undersigned will not require that information in the notice.

### 4. Right to Independent Legal Representation

Defendants object that the notice does not inform recipients that they have the right to obtain independent legal representation.  (Doc. 45 at 21-22).  Plaintiffs point out that nothing in the notice indicates otherwise.  (Doc. 51 at 9-10).  However, the notice is at best vague about class members' legal rights if they do not opt in.  Therefore, Plaintiffs will be required to modify the relevant paragraph to add the bolded, underlined text below:

> The case is in an early stage, and there has not been a decision by the court as to whether the dancers' position or The Furnace's position is the correct one. There has also not been any settlement reached. If you do not return the enclosed consent form by [DATE], 2022, you may not be considered part of this case and may not be able to receive a share of any settlement or judgment that the plaintiffs may obtain under the federal claims in this case. If you do participate in the case, you will be bound by any ruling entered by the court or settlement reached by the parties.  **If you choose not to join this lawsuit, you retain your rights, if any, that you may have under the Fair Labor Standards Act, and you are free to file your own lawsuit with legal representation of your choice**.

### 5. Statements Concerning Opt-Ins Obligations and Rights

Defendants request that the notice "warn potential plaintiffs of the possible costs and liabilities of joining this action in order to facilitate an informed decision" as to whether to join the lawsuit, including that Defendants may attempt to recover its costs from the potential class members if the lawsuit is unsuccessful and yet it fails to do so." (Doc. 45 at 22-23) (quoting *Pares*, 2013 WL 3279803, at *10).  While it is true some courts have required such language, the undersigned agrees with courts that have found that it is unwarranted because it has the "potential of chilling participation in the collective action." *Bath v. Red Vision Systems, Inc* ., 2014 WL 2436100, at *7 (D.N.J. May 29, 2014). *See also Dilonez v. Fox Linen Service*, *Inc.*, 35 F. Supp. 3d 247, 256 (E.D.N.Y. July 25, 2014) (rejecting similar language "because it imposes an *in terrorem* effect that is disproportionate to the actual likelihood the costs or counterclaim damages

will occur") (cleaned up).  Therefore, the undersigned declines to require such language in the notice.

### 6. Disclosure of Personal Information

Plaintiffs have requested Defendants disclose "a list of the dancers who have worked at The Furnace, including their names and last-known mailing addresses, telephone numbers, email addresses, work locations, copies of driver's license (this is common to prove age) and dates they have worked at The Furnace."  (Doc. 41-1 at 18).  Defendants object that it is "intrusive" for them to produce work locations, driver's licenses, and phone numbers.  (Doc. 45 at 23).  However, it does not appear to be any more intrusive to Defendants to produce this information than it would be to produce any other work-related information.  Furthermore, since the undersigned has granted leave for Plaintiffs to seek notice by text message if circumstances show that other methods of notice are inadequate, it would save time for Plaintiffs to already have phone numbers on hand.  Thus, the undersigned grants Plaintiffs' request.

### C. Tolling of Limitations Period

Because the statute of limitations continues to run for putative class members until they opt in to the collective action, 29 U.S.C. § 256, Plaintiffs have requested that the statute of limitations be tolled during the notice period.  (Doc. 41-1 at 20).  Defendants object that Plaintiffs do not represent putative plaintiffs and cannot seek relief on their behalf.  In support, they cite *Cameron-Grant v. Maxim Healthcare Servs.*, 347 F.3d 1240, 1249 (11th Cir. 2003), for the proposition that "a plaintiff in a FLSA action has no right to represent other plaintiffs and the action does not become a 'collective action' until other plaintiffs affirmatively opt into the class by giving written and filed consent."  (Doc. 45 at 23-24).  Defendants contend any opinion regarding equitable tolling as to putative plaintiffs would be an advisory opinion.  But the court is

not being asked to enter a judgment here, which is the thrust of the portion of *Cameron-Grant* Defendants quote. *See Cameron-Grant*, 347 F.3d at 1249 ("Until such consent [to join an FLSA suit] is given, no person will be bound by or may benefit from *judgment*.") (emphasis added). The case says nothing about whether a court may toll the limitations period.

However, it is premature to decide the issue of equitable tolling. To warrant equitable tolling, a plaintiff must prove "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." *Villarreal v. R.J. Reynolds Tobacco Co.*, 839 F.3d 958, 971 (11th Cir. 2016) (quoting *Menominee Indian Tribe of Wisc. v. United States*, 577 U.S. 250, 255 (2016)). "[W]hen plaintiffs seek equitable tolling related to notice provided to potential opt-ins in FLSA actions, they must provide evidence of the diligence of the potential opt-in plaintiffs—not the named plaintiffs who are already part of the case—to assert their rights within the statutory period in the face of extraordinary circumstances." *Rojas v. Garda CL Se., Inc.*, 297 F.R.D. 669, 680 (S.D. Fla. 2013) (citation omitted). Since it is unclear to whom equitable tolling would even apply, Plaintiffs cannot make this factual showing at this stage. The undersigned therefore reserves the issue, and Plaintiffs may reassert their request if it becomes apparent that any dancer's claims would be barred if the statute of limitations were not equitably tolled.

### IV. Conclusion

For the reasons stated above, and based on the undersigned's discretion, Plaintiffs' motion for conditional class certification, (doc. 41), is **GRANTED IN PART** and **DENIED IN PART**.

1. The motion is **GRANTED** to the extent that the undersigned conditionally certifies the class Plaintiffs have requested and **APPROVES** the proposed notice as modified above.

2. The motion is **DENIED WITHOUT PREJUDICE** to the extent that at this time the undersigned will not (1) require Defendants to display the notice at The Furnace or on its website; (2) approve notice by text message; or (3) decide the issue of equitable tolling.  Plaintiffs may reassert any of these requests if circumstances change consistent with the analysis above.  The motion is **DENIED** to the extent the undersigned will not permit a reminder notice.

3. To facilitate the provision of notice, Defendants are **ORDERED**, within **10 days**, to provide to Plaintiffs' counsel in a mutually agreeable format a list containing the names, last-known mailing addresses, email addresses, phone numbers, and work locations of any dancer who worked at The Furnace from March 17, 2019 to the present, along with a copy of each dancer's driver's license (if available).

4. Plaintiffs' counsel is authorized to give notice to the individuals in the conditionally certified class.  Plaintiffs' counsel may do so in a reasonable time, but no later than **April 11, 2022**.  Each conditionally certified class member will have **60 days** from the date of mailing to opt into this action.

5. No later than **June 13, 2022** Plaintiffs' counsel shall file all consent forms with the court, along with consent elections as to magistrate judge jurisdiction for each opt-in plaintiff.

Defendants' motion to seal, (doc. 50), is **GRANTED**.  The parties are **ORDERED** to confer and submit a joint protective order applicable to the names of the declarants in docs. 46-2 through 46-11 within **10 days**.  Defendants shall produce the names of the declarants to Plaintiffs' counsel within **1 day** of the entry of that protective order.

DONE this 17th day of March, 2022.

_____
**JOHN H. ENGLAND, III**
UNITED STATES MAGISTRATE JUDGE