FILED

2023 Sep-13  PM 02:54
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| JORDAN MANASCO, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No.:  2:21-cv-00381-JHE |
| | ) | |
| BEST IN TOWN, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

### MEMORANDUM OPINION AND ORDER[1]

Through their amended complaint, Plaintiffs Jordan Manasco ("Manasco"), Katrina Perez ("Perez"), Peyton Mastropolo ("Mastropolo"), Stephanie Jeronymo ("Jeronymo"), Giddel Endaya Lynn ("Lynn"), Brittany Swan ("Swan"), Kelsey Lucas ("Lucas"), Laurel Hamrick ("Hamrick"), Julianna Edgerton ("J. Edgerton"), Jasmine Dove ("Dove"), Brianna Pettit ("Pettit"), Caitlin Glass ("Glass"), Constance Edgerton ("C. Edgerton"), Laura Slovensky ("Slovensky"), Jessica Campbell ("Campbell"), Miranda Fulcher ("Fulcher") and Nikkita Gordon ("Gordon") (collectively, "Plaintiffs") bring this action against Defendants Best In Town, Inc. ("Best In Town"), Gregory L. Jackson and Graham G. Jackson, alleging violations of the Fair Labor Standards Act ("FLSA").  (Doc. 27).  Plaintiffs have moved for partial summary judgment on multiple issues: whether they are employees or independent contractors, whether Defendant Graham Jackson is an employer under the FLSA, and whether Defendants are entitled to two affirmative defenses.  (Doc. 95).  Defendants oppose the motion (doc. 99), and Plaintiffs have filed

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have voluntarily consented to have a United States Magistrate Judge conduct any and all proceedings, including trial and the entry of final judgment.  (Docs. 32 & 56).

a reply in support (doc. 105).  For the reasons discussed below, the motion for partial summary judgment is **GRANTED IN PART**.

## I. Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party bears the initial burden of proving the absence of a genuine issue of material fact.  *Id.* at 323.  The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish there is a "genuine issue for trial."  *Id.* at 324.  (citation and internal quotation marks omitted).  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The Court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, (1970); *see also Anderson*, 477 U.S. at 255 (all justifiable inferences must be drawn in the non-moving party's favor).  Any factual disputes will be resolved in Plaintiff's favor when sufficient competent evidence supports Plaintiff's version of the disputed facts.  *See Pace v. Capobianco*, 283 F.3d 1275, 1276–78 (11th Cir. 2002) (a court is not required to resolve disputes in the non-moving party's favor when that party's version of the events is supported by insufficient evidence).  However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat

2

a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mtn. Park, Ltd. v. Oliver*, 836 F.2d 1560, 1563 (11th Cir. 1989)).  Moreover, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party."  *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252).

## II. Summary Judgment Facts

### A. Parties

Defendant Best In Town operates an exotic dance club in Birmingham, Alabama, under the trade name "The Furnace."  (Deposition of Gregory L. Jackson (doc. 99-15, "Gregory Depo.") at 5 (11:25–12:3)).[2]  Best In Town is solely owned and operated by Defendant Gregory L. Jackson ("Gregory").[3]  (*Id.* (11:25–12:9)).   The physical property The Furnace leases is owned by Downtowner, LLC, a minority share of which is owned by Gregory and a majority share of which is owned by Defendant Graham G. Jackson ("Graham," Gregory Jackson's younger brother).  (*Id.* at 5–6 (12:21–13:4)).

Plaintiffs each worked as exotic dancers at The Furnace:[4]

_____

[2] Plaintiffs have submitted deposition excerpts, while Defendants have submitted the entire depositions in opposition to Plaintiff's motion.  For clarity, this memorandum opinion cites to Defendants' versions where possible.

[3] Gregory testified that he is Best In Town's sole director and attends corporate meetings by himself.  (Gregory Depo. at 8 (21:23–22:7)).

[4] Plaintiffs reference the Declaration of Jessica Campbell (doc. 95-1 at 11), stating as an undisputed fact that she worked at The Furnace as a dancer between January 2019 and June 2022.  They have not attached that declaration as an exhibit.  Assuming Plaintiffs can furnish proof of Campbell's status consistent with this missing declaration, the analysis in this memorandum opinion applies equally to her.  Therefore, although Plaintiffs' motion will be denied as to Campbell at this time because they have failed to provide any evidence that Campbell worked at The Furnace during the relevant time period, the undersigned will grant them leave to provide that evidence.

- Manasco worked at The Furnace as a dancer from approximately 2017 to March 4, 2021. (Declaration of Jordan Manasco (doc. 95-3, "Manasco Decl.") at ¶ 3);

- Mastropolo worked at The Furnace as a dancer between March 2018 and January 2021 (Declaration of Peyton Mastropolo (doc. 95-4, "Mastropolo Decl.") at ¶ 3);

- Perez worked at The Furnace as a dancer from approximately June 2019 to January 2021 (Declaration of Katrina Perez (doc. 95-5, "Perez Decl.") at ¶ 3);

- Jeronymo worked at The Furnace as a dancer between July 21, 2018, and May 15, 2021 (Declaration of Stephanie Jeronymo, (doc. 95-6, "Jeronymo Decl.") at ¶ 3);

- Lynn worked at The Furnace as a dancer between August 2018 and December 2019 (Declaration of Giddel Endaya Lynn (doc. 95-7, "Lynn Decl.") at ¶ 3);

- Swan worked at The Furnace as a dancer between February 2021 and August 2021 (Declaration of Brittany Swan (doc. 95-8, "Swan Decl.") at ¶ 3);

- Lucas worked at The Furnace as a dancer between August 2018 and February 2019 (Declaration of Kelsey Lucas (doc. 95-9, "Lucas Decl.") at ¶ 3);

- Hamrick worked at The Furnace as a dancer between August 2020 and May 2022 (Declaration of Laurel Hamrick (doc. 95-10, "Hamrick Decl.") at ¶ 3);

- J. Edgerton worked at The Furnace as a dancer between May 2019 and March 2020 (Declaration of Julianne Edgerton (doc. 95-11, "J. Edgerton Decl.") at ¶ 3);

- Dove worked at The Furnace as a dancer between May 2019 and July 2019 (Declaration of Jasmine Dove (doc. 95-12, "Dove Decl.") at ¶ 3);

- Pettit worked at The Furnace as a dancer between 2017 and 2019 (Declaration of Briana Pettit (doc. 95-13, "Pettit Decl.") at ¶ 3);

- Glass worked at The Furnace as a dancer between May 2019 and December 2021 (Declaration of Caitlin Glass (doc. 95-14, "Glass Decl.") at ¶ 3);

- C. Edgerton worked at The Furnace as a dancer between May 2019 and December 2019 (Declaration of Constance Edgerton (doc. 95-15 ("C. Edgerton Decl.") at ¶ 3);

- Slovensky worked at The Furnace as a dancer between June 2019 and March 2020 (Consent Form of Laura Slovensky, doc. 95-16);

- Fulcher worked at The Furnace as a dancer between approximately August 2020 and May 2022 (Declaration of Miranda Fulcher, (doc. 95-17, "Fulcher Decl.") at ¶ 3;

- Gordon worked at The Furnace as a dancer between May 2020 and August 2020 (Declaration of Nikkita Gordon (doc. 95-18, "Gordon Decl.") at ¶ 3;

**B. The Furnace**

Graham is the primary manager of The Furnace and has worked there since 2015. (Gregory Depo. at 8 (22:8–10); Deposition of Graham G. Jackson (doc. 99-15, "Graham Depo.") at 6 (14:8–19)). Graham has final say on The Furnace's rules, except as to his brother. (Graham Depo. at 8 (21:10–15)). On more important decisions, the brothers consult with each other. (*Id.* at 7–8 (21:16–22:2)).

The Furnace has additional managers under Graham. Manager Christian Bermudez reports to Graham, who is his direct boss. (Deposition of Christian Bermudez (doc. 95-22, "Bermudez Depo.") at 2–4 (12:14–13:8, 14:2–7), 7 (18:2–6)). Manager Johnny Scruggs ("Scruggs") reports to Graham as well. (Deposition of Johnny Jefferson Scruggs (doc. 99-23, "Scruggs Depo.") at 6–7 (16:10–17:12)). Scruggs testified that Graham sets policies and procedures for The Furnace. (*Id.* at 7 (17:13–19:9), 10 (30:15–19)).

At The Furnace, topless dancers are the primary form of entertainment. (Manasco Decl. at ¶ 2). Dancers are an integral part of The Furnace's business. (Gregory Depo. at 12 (37:22–25)). The Furnace's website (thefurnacebham.com) states: "The Furnace features the best dancers in the Southeast. Blonde, brunette, or red head – whatever you have an appetite for – we have them . . . the Southeast's most talented and beautiful women!!!" (Scruggs Depo. at 15–16 (51:14–15, 52:5–53:3)).

Prior to opening The Furnace in the early 2000s, Graham consulted with a (now-deceased) lawyer and with the Birmingham Vice Department. (Graham Depo. at 7 (18:17–19:19, 20:5–10); Gregory Depo. at 7 (17:10–25)). Local officials advised Graham that he must require dancers to

obtain a dancing permit and a business license before they could entertain at The Furnace. (Graham Depo. at 12 (38:18–40:6)).   Graham testified that he believed the dancers to be independent contractors based on this advice.  (Graham Depo. at 12–13 (38:18–40:6, 41:12–16)). Through its Tax and License Administrator, Elton L. Hammonds, the City of Birmingham states that it does not offer advice regarding compliance with the FLSA or how to engage an independent contractor; to Hammonds' knowledge, the City of Birmingham has never advised The Furnace's owners that possession of a permit and license renders a dancer an independent contractor.  (Doc. 95-30 at ¶¶ 5, 7–8).

Consistent with the licensure advice Graham received, The Furnace requires dancers to have a valid dancer's permit and a valid business license (Division IV Dancing) prior to dancing at the club.  (Graham Depo. at 7 (18:17–20:10); Declaration of Jenny Sartain, (doc. 99-2, "Sartain Decl.") at ¶ 5).[5]  Dancers at The Furnace are aware of this requirement.  (Doe Decls. at ¶¶ 5, 9).[6]

---

[5] Jenny Sartain is The Furnace's office manager.  (Sartain Decl. at ¶ 1).

[6] Defendants have submitted ten declarations from dancers as exhibits B–K to their response.  (Docs. 99-3 through 99-12).  Those declarations are identical apart from portions (some fill-in-the-blank) where each dancer provides her name (*e.g.*, doc. 99-3 at 1), how long she has performed at The Furnace (*e.g., id.* at ¶ 4), what other similar venues she has performed at during the relevant time (*e.g., id.* at ¶ 8), and her stage name, (*e.g., id.* at ¶ 59).  Since each of these provides the same evidence in support of most of the issues here, the undersigned cites to these collectively as "Doe Decls."

Defendants have separately moved to maintain unredacted versions of these declarations and some additional records under seal.  (Doc. 100).  The identities of the Jane Doe dancers are known to Plaintiffs and are already the subject of a protective order.  (*See* docs. 62 & 64).  Plaintiffs oppose only the request to maintain the declarations under seal.  (*See* doc. 105).  Plaintiffs' opposition is essentially a challenge to the validity of the facts contained in the declarations, which they consider to be coerced "false testimony."  (*Id.* at 2-3).  Plaintiffs seek to strike the declarations from the record as "untrustworthy and scandalous material."  (*Id.* at 6).

Plaintiffs' argument does not actually go to the relief Defendants seek.  The undersigned declines to revisit the terms of the protective order; the rationale behind allowing the dancers anonymity is equally strong regardless of whether Plaintiffs believe their declarations are truthful.

The Furnace does not require dancers to have a certificate in dance.  (Graham Depo. at 10 (29:16–30:6)).  The Furnace's local municipal license certify dancers' ages, not their dancing abilities. (Scruggs Depo. at 13 (41:10–11)).

The Furnace has three stages, built by the contractor who built the club and financed through Downtowner, LLC.  (Graham Depo. at 8 (24:3–25:7)).  The Furnace installed poles on the stages and owns the PA system used by the DJ.  (Scruggs Depo. at 19 (67:9–17)).  The Furnace pays the ASCAP fees for the rights to play music at the club, and it controls the content of the music.  (*Id.* at 19–20 (68:23–69:23)).  The Furnace's dancers do not pay the club's utility bills or the club's insurance.  (*Id.* at 20–21 (72:15–17, 73:6–14); Deposition of Jenny Sartain (doc. 99-16, "Sartain Depo.") at 8 (24:2–15)).

Graham and Gregory set The Furnace's hours: 4:00 p.m. to 2:00 a.m. on weeknights and until 4:00 a.m. on weekends.  (Graham Depo. at 8 (22:11–23:7)).  Dancers are not involved in setting The Furnace's hours.  (Scruggs Depo. at 10 (32:18–20); Manasco Decl. at ¶ 5).  Customers are only present during those hours, regardless of whether dancers want to work outside those hours.  (Graham Depo. at 8 (23:16–24:2); Manasco Decl. at ¶ 4).  The Furnace controls which customers may enter the club.  (Bermudez Depo. at 6 (17:15–18:1); Scruggs Depo. at 20 (71:2–10)).  The Furnace's management also determines whether customers who are involved in disputes

---

Additionally, as the undersigned is granting Plaintiffs' motion for summary judgment, Plaintiffs experience no prejudice from the undersigned considering the declarations.  The undersigned also notes that the Jane Doe declarations have considerable overlap with information contained in Jenny Sartain's declaration, so striking the declarations would have little effect on the evidentiary record before the court at summary judgment.  Therefore, Defendants' motion to seal is **GRANTED**. The Clerk is **DIRECTED** to docket the exhibits referenced in the attachment to that motion under seal.

with dancers leave The Furnace.  (Graham Depo. at 11 (33:2–13); Scruggs Depo. at 20 (71:11–72:14); Bermudez Depo. at 8–9 (20:9–21:6)).

### C. Rules Pertaining to Dancers at The Furnace

Dancers are required to abide by "The Furnace Rules," a document created by Graham. (Graham Depo. at 16–17 (55:15–57:7); doc. 95-21).  The Furnace Rules require dancers to (among other things) comply with local ordinances concerning nudity (e.g., Rules 3 and 14), have "perfect" appearance subject to inspection and changes by the "house mom" (Rule 4), refrain from carrying a Crown Royal bag as a purse (Rule 5), change outfits throughout the night (Rule 6), listen to the DJ and be on time for their performances (Rule 11), not leave the stage until the next dancer arrives (Rule 12), only consume two drinks per night (Rule 13), and so on.[7]  (*See* doc. 95-21).  If a dancer fails to follow the rules, she could be suspended at Graham's election.  (Deposition of Donna Bozeman (doc. 107-3, "Bozeman Depo.") at 9 (24:6–15)).

Dancers may generally perform as they wish and select their own clothes, shoes, and makeup style, as well as themes or props used in performances.  (Sartain Decl. at ¶ 9; Doe Decls. at ¶¶ 13, 36).  However, dancers' appearances were subject to some approval by The Furnace's staff.  For example, Donna Bozeman ("Bozeman"), The Furnace's "house mom"[8] during the

---

[7] Defendants state the guidelines applicable to dancers are "essentially that the entertainers comply with state and local laws while performing at The Furnace," a claim they derive from the Jane Doe dancers' declarations.  (Doc. 99 at 5) (citing Doe Decls. at ¶ 12).  This testimony does not create a *genuine* dispute of material fact because no reasonable jury could credit the dancers' description of the Rules over the Rules themselves.  Accordingly, the undersigned accepts that The Furnace Rules reflects the guidelines dancers at The Furnace were required to follow.

[8] According to Bozeman, the job of a house mom is "basically to take care of the dancers, make sure they had everything they needed, make sure that they understand, you know, how we operate.  Just anything that had to do with the dancers, it seemed like it was my responsibility." (Bozeman Depo. at 6–7 (12:17–20, 14:15–22)).

relevant time period, texted Mastropolo (whose stage name was "Luna"): "Hey, Luna, get your nails done before you come back . . . Your nails should not look like that." (Bozeman Depo. at 12 (35:17–36:7); doc. 95-26).

Additionally, each dancer is required to sign a document titled "Things You Should Know As An Independent Contractor" prior to starting work at The Furnace. (Scruggs Depo. at 21–22 (75:20–76:14, 78:4–17)). Among other things, that document states The Furnace's policy that "entertainers will work a minimum of 4 days a week unless prior written approval has been given." (Doc. 95-24). In practice, dancers perform at The Furnace as many days per week, month, and year as they choose.[9] (Doe Decls. at ¶ 27; Sartain Decl. at ¶ 9). Dancers are not required to inform The Furnace when they are working at other clubs or do not wish to perform for other reasons; instead, dancers report to The Furnace when they want to perform. (Doe Decls. at ¶ 21, 24; Sartain Decl. at ¶ 9).

Bozeman testified that she coordinated the schedules for Plaintiffs and other dancers. (Bozeman Depo. at 8–9 (21:12–22:24)). If The Furnace did not have enough dancers scheduled, Bozeman would contact available dancers and direct them to work an extra shift. (*Id.* at 16 (52:22–53:19)). Notwithstanding The Furnace's scheduling requirements, dancers were free to pursue other jobs, including work at other nightclubs. (Sartain Decl. at ¶ 9). Plaintiffs Lynn, Swan, and Jeronymo each testified that they danced at other nightclubs in Alabama and other states. (Deposition of Giddel Endaya Lynn (doc. 99-19, "Lynn Depo.") at 6 (18:10–20); Deposition of

---

[9] Other evidence in the record indicates that, consistent with its written policy, The Furnace requires dancers to work four shifts a week. (*See* Bozeman Depo. at 11 (31:8-11); Manasco Decl. at ¶ 7). For summary judgment purposes, the undersigned resolves this dispute in Defendants' favor.

Brittany Swan (doc. 99-20, "Swan Depo.") at 8 (27:6–23); Deposition of Stephanie Jeronymo (Doc. 99-22, "Jeronymo Depo.") at 5–6 (15:9–17:8)).

### D. Dancers' Work and Compensation

The Furnace allows its customers to purchase two types of dance experiences: private dances and private rooms. In private rooms, customers are charged for units of time, while customers are charged per song for private dances. (Bermudez Depo. at 10 (22:14–19)). Through Graham, The Furnace sets the base price for a private dance at $20 per song. (Scruggs Depo. at 10–11 (28:17–22, 30:11–14); Manasco Decl. at ¶ 9). These prices were recommended, but dancers have discretion to charge more than this rate. (Scruggs Depo. at 10 (28:12); Doe Decls. at ¶ 44; Sartain Decl. at ¶¶ 10–12). Graham also dictates The Furnace's baseline price for VIP room access: per 15-minute increment, the customer pays $50 for the room and $100 to the dancer. (Scruggs Depo. at 10 (29:19–30:10)). Dancers are not required to pay to use the VIP rooms. (Doe Decls. at ¶ 43).

Customers pay dancers separately from The Furnace. (Scruggs Depo. at 10 (29:16–30:8)); Manasco Decl. at ¶ 9). Plaintiffs receive payment directly from customers (rather than from management) when providing dances. (Sartain Depo. at 12 (39:3–9)); Manasco Decl. at ¶ 9–10). The Furnace's point of sale ("POS") system does not identify how much income a dancer receives from dances, note what dancers are present when The Furnace receives income, or track money paid by customers for private dances. (Scruggs Depo. at 9 (25:17–26:13), 11 (33:5–34:9)). Dancers also receive tips from customers distinct from fees for dances; The Furnace does not require that customers tip dancers and customers provide tips depending on their satisfaction with the dancer. (Doe Decls. at ¶¶ 46–47).

Before a dancer starts her shift, the house mom takes her car keys.  (Bermudez Depo. at 5 (16:8–17)).  After a dancer checks in with the house mom, the DJ adds the dancer to the "rotation." (Bermudez Depo. at 11–12 (24:4–25:5); Bozeman Depo. at 9 (23:33–24:5)).  Dancers were not required to perform in the rotation, and they could skip stage calls if they chose.[10]  (Sartain Decl. at ¶ 9; Doe Decls. at ¶ 15).  Manasco testified there were nights during which she only performed in the VIP area without doing stage dances, but she would already have to have a customer in the room to do so.  (Deposition of Jordan Manasco (doc. 99-17, "Manasco Depo.") at 16 (59:3–60:3)). Dancers were also encouraged (but not required) to remove their tops during their stage performances; for example, Scruggs would "walk up to the stage and ask her, hey, we're a bikini bar, we're – we're a topless I mean.  We're not a bikini bar . . . they're not going to tip you if you don't take your top off."  (Scruggs Depo. at 16–17 (56:18–58:13)).

Dancers are responsible for choreographing their own dances and practicing for performances.  (Doe Decls. at ¶ 19).  Dancers can choose their own stage personas and how they perform, and they are able to select their preferred music when performing on stage.  (Doe Decls. at ¶ 22; Sartain Decl. at ¶ 9).  Dancers also control their interactions with customers and potential customers, sometimes exchanging contact information with them to communicate directly when they will be performing at The Furnace.  (Doe Decls. at ¶ 20; Sartain Decl. at ¶ 9; Lynn Depo. at

---

[10] The parties dispute what happens once a dancer's name comes up during the rotation. Plaintiffs contend dancers are required to dance for two songs once their name is called; by the end of the second song, Plaintiffs contend dancers are required to remove their tops.  (Doc. 95-1 at 16-17).  By contrast, Defendants cite the anonymous dancers' declarations for the proposition that dancers are not required to participate in the rotation and choose to what extent they will perform semi-nude.  (Doc. 99 at 6) (citing Doe Decls. at ¶¶ 16, 18; Sartain Decl. at ¶ 9).  The characterization in this paragraph resolves this dispute in Defendants' favor for summary judgment purposes.

9 (31:1–16); Jeronymo Depo. at 11 (39:18–40:8)).  Dancers maximize their income through hard work, initiative, communications with potential customers, and creating their personas.  (Doe Decls. at ¶ 32).  Dancers are responsible for advertising and promoting themselves and their performances, which some do by maintaining a phone list of customers to notify for performances, obtaining promotional materials such as customized lighters, maintaining social networking sites, and passing out flyers and business cards.  (Doe Decls. at ¶¶ 38–39; doc. 99-24; 99-26; Jeronymo Depo. at 11 (39:18–40:8)).

Dancers have no opening or closing duties at The Furnace, are not required to clean the stages or dressing rooms, and may drink alcohol and eat at any time.  (Manasco Depo. at 17–18 (63:21–65:16); Deposition of Peyton Mastropolo (doc. 99-18, "Mastropolo Depo.") at 22–23 (83:5–84:7, 85:21–86:3); Lynn Depo. at 10–11 (36:20–37:14); Jeronymo Depo. at 11 (39:7–17) 13 (45:1–13)).  The Furnace does not permit dancers to hire others to work for them, and dancers have no managerial responsibilities.  (Scruggs Depo. at 22 (80:1–16); Manasco Decl. at ¶ 15).

### E. Dancer Fees and Expenses

The Furnace charges dancers a number of fees when they perform, based on a system set up by Graham.  (Sartain Depo. at 10 (32:12–14)).  These fees range from $45 to $65 and cover a number of services provided by The Furnace, including access to dressing rooms, lockers, cleaning and preparation of stages, security, and getting cash for customers to tip.  (Scruggs Depo. at 13 (44:4–13); Sartain Depo. at 10 (32:8–11); Sartain Decl. at ¶ 6).  To encourage dancers to arrive earlier, the fees vary depending on when a dancer arrives; the later the dancer shows, the higher the fee.  (Scruggs Depo. at 13–14 (44:14–45:5)).  The Furnace receives about $21,000.00 per month in dancer fees in a typical non-COVID year.  (Sartain Decl. at ¶ 6).  The house mom is responsible for collecting the fees.  (Bozeman Depo. at 7 (15:1–2)).

Graham also established a policy under which The Furnace charges fees to dancers who arrive late to work. (Bozeman Depo. at 13–14 (41:1–42:3); Manasco Decl. at ¶ 7). The Furnace management requires dancers who did not show for a shift to pay house fees for the missed shift. (Bozeman Depo. at 14 (43:3–44:2)). For example, Mastropolo sent Bozeman a text message on October 6, 2020,[11] informing Bozeman that she would miss a shift. (Doc. 95-28; Bozeman Depo. at 18 (58:5–61:7)). Bozeman responded, "You will owe for today. I will get it from you next week. I will give you the same schedule for next week that you have for this week." (*Id.*).

Dancers also pay The Furnace's DJs out of their tips; DJs are not otherwise paid by The Furnace. (Scruggs Depo. at 12 (37:7–11), 16 (56:14–17)). The Furnace does not force dancers to tip DJs, bartenders, or others, although (consistent with industry practice) most dancers do tip The Furnace's service providers.[12] (Sartain Decl. at ¶ 4; Doe Decls. at ¶¶ 49–51). The Furnace does not fine or discipline dancers who do not "tip out" these other workers. (Doe Decls. at ¶ 52).

Dancers are responsible for profits and losses from their performances. (Doe Decls. at ¶ 30).[13] Dancers also pay for their own appearance-related business expenses, such as clothing, exercise, maintaining grooming, cosmetic surgery, nails, makeup, and hairstyling. (Doe Decls. at ¶¶ 35–36; Lynn Depo. at 9–10 (31:1–16, 32:15–34:19); Jeronymo Depo. at 10–11 (35:4–36:16, 39:18–40:8); Mastropolo Bates 248 and 375). Some dancers deducted dancing-related expense from their taxes, including clothing, vehicles, personal poles for their homes, and cosmetic

---

[11] The text message is dated "Tuesday, October 6," with no year referenced. 2020 is the only year during the relevant time period in which October 6 occurred on a Tuesday.

[12] The parties dispute whether The Furnace requires dancers to tip DJs. For purposes of this motion for summary judgment, that dispute is resolved in Defendants' favor.

[13] Defendants also cite the Jane Doe declarations for the proposition that dancers "have a significant opportunity for profit and loss as a professional entertainer . . . ." (Doc. 99 at 9-10) (citing Doe Decls. at ¶ 31). This is a legal conclusion rather than a fact.

surgery.[14]  (Sartain Decl. at ¶ 9; Lynn Depo. at 9–10 (31:1–16, 32:15–34:19); Jeronymo Depo. at

10–11 (35:4–36:16, 39:18–40:8); Mastropolo Bates 248 and 375).

## III. Discussion

Plaintiffs' amended complaint contains multiple claims under the FLSA.  (*See generally*

doc. 27).  Plaintiffs have moved for summary judgment on four discrete issues: (1) whether they

are employees under the FLSA; (2) whether Graham Jackson is an employer under the FLSA; (3)

whether Defendants can demonstrate their good faith affirmative defense; and (4) whether

Defendants can demonstrate their offset affirmative defense.  (*See* doc. 95-1).  None of these issues

are dispositive of any of the claims in the complaint, so the undersigned analyzes each issue below

without reference to the complaint's claims.

### A. Classification as Employees

The FLSA's overtime and minimum wage protections extend only to "employees" and not

to "independent contractors."  29 U.S.C. §§ 206, 207; *Scantland v. Jeffry Knight, Inc.*, 721 F.3d

1308, 1311 (11th Cir. 2013) (citation omitted).  To distinguish between the two, courts assess the

"economic reality" of the relationship between the parties rather than the label the parties have

given the relationship.[15]  *Scantland*, 721 F.3d at 1311.  The Eleventh Circuit has looked to six

guiding factors to make this determination, none of which are individually determinative:

---

[14] In presenting this fact, Defendants contend "[m]any of the Plaintiffs failed to produce their tax returns . . . ."  (Doc. 99 at 4 n.2).  This is discussed further below.  *See infra*, n.19.

[15] For this reason, the undersigned does not consider relevant evidence such as statements in the anonymous dancers' declarations that they "operate [their] own business as an independent contractor and not an employee" (Doe Decls. at ¶ 9) and Jeronymo's application for a loan through the Paycheck Protection Program as a "sole proprietor" of a business (doc. 100-1, Jeronymo Bates 255) (sealed, *see supra*, n.6).

(1) the nature and degree of the alleged employer's control as to the manner in which the work is to be performed;

(2) the alleged employee's opportunity for profit or loss depending upon his managerial skill;

(3) the alleged employee's investment in equipment or materials required for his task, or his employment of workers;

(4) whether the service rendered requires a special skill;

(5) the degree of permanency and duration of the working relationship;

(6) the extent to which the service rendered is an integral part of the alleged employer's business.

*Id.* at 1311–12.  The court's ultimate focus is on "whether an individual is in business for [her]self or is dependent upon finding employment in the business of others."  *Id.* at 1312 (citation and internal quotation marks omitted).

The Eleventh Circuit has directly not resolved this question as it pertains to exotic dancers, but "[d]istrict courts in the Eleventh Circuit have uniformly found exotic dancers to be employees of the clubs in which they perform." *Schofield v. Gold Club Tampa, Inc.*, 2021 WL 533540, at *4 (M.D. Fla. Feb. 12, 2021) (citation omitted).  Consistent with this, the vast weight of authority from lower courts appears to support that dancers are generally considered employees under the FLSA.  (*See* doc. 95-1 at 25–28) (collecting cases).  Guided by that authority, none of which is binding, the undersigned considers each factor below before assessing their balance.

**1. Control Over Work**

The bulk of the parties' dispute—and the majority of the conflicts in the evidence— concerns the first factor: "the nature and degree of the alleged employer's control as to the manner in which the work is to be performed." *Scantland*, 721 F.3d at 1312.  "Courts considering the status of exotic dancers under the FLSA generally look not only to the guidelines set by the club

15

regarding the entertainers' performances and behavior, but also to the club's control over the atmosphere and clientele." *Butler v. PP & G, Inc.*, 2013 WL 5964476, at *3 (D. Md. Nov. 7, 2013).

In their reply, purportedly accounting for facts put into dispute by Defendants' response, Plaintiffs note the following facts they contend are not in dispute: "(1) The Furnace's Club Rules that apply to all dancers; (2) The Furnace requires all dancers to work at least four days per week (3) The Furnace's house mom takes the dancers' car keys before each shift pursuant to the Furnace's policies; (4) Dancers could and would be suspended for failure to follow The Furnace's rules; (5) Dancers' primary role at The Furnace is to dance to provide entertainment to The Furnace's customers; (6) Defendants paid for rent, advertising, insurance, and utility bills for The Furnace; (7) The Furnace's house mom set a weekly schedule for Plaintiffs; (8) The Furnace penalized Plaintiffs if they missed a shift by charging a 'late fee.'; (9) The Furnace's DJ informs dancers when they are up next to dance, and dancers must dance for two songs, and be topless by the end of the second song." (Doc. 107 at 3–4). Of these, (2) and (9) are actually in dispute (and the undersigned has resolved those disputes in Defendants' favor for summary judgment purposes), and (7) is subject to some significant caveats. However, the remainder of these indicia of control are undisputed. Plaintiffs also point to two other facts in favor of a finding of control: The Furnace sets a minimum charge of $20 per dance and The Furnace controls the hours of operation during which Plaintiffs can perform. (*Id.* at 5–6).

In contrast, Defendants assert that the following facts tip this factor the other way: (1) dancers "can pursue other careers and work at other night clubs"; (2) they can "set their own schedules; (3) they "were not required to perform any particular number of stage dances, VIP dances or private dances and there were no repercussions for not performing on stage"; (4) "The

Furnace did not control where the entertainers performed or for whom they performed, their costumes, shoes or when to remove items"; (5) dancers do "not have to provide advance notice of their intention to perform on a particular night, they can still show up and perform"; (6) dancers "came and went at their convenience and while it was preferred that they work 4 times a week, the actual work time varied with some entertainers working less than 5 times a month at times and other times 12 or more times a month"; (7) "The Furnace has rules and guidelines related to entertainers, they are essentially that the entertainers comply with the state and local laws while performing at The Furnace and many apply equally to the customers"; and (8) dancers "were free to tip as they wished and The Furnace does not force anyone to tip." (Doc. 99 at 17–18). Of these, as stated above, the undersigned rejects (7) as the Jane Doe dancers' characterization of The Furnace Rules rather than the actual content of the Rules. *See supra*, n.7.

Comparing the undisputed facts on either side of the equation, the undersigned finds they support that The Furnace exercised enough control over Plaintiffs to tip this factor in Plaintiffs' favor. First, and most crucially, The Furnace controlled dancers' access to the club and its customers by controlling the hours during which dancers could perform at the club and the customers dancers could interact with. While dancers could and did advertise themselves to customers via social media and other means in an effort to draw them to The Furnace, that was insufficient for a dancer to actually *perform* for those customers. Instead, dancers were dependent on The Furnace to admit those customers during its operating hours, which were the only times dancers could perform. A dancer had no ability to perform for a customer during hours The Furnace was not open and thus no ability to follow through on her attempts to advertise herself without The Furnace's acquiescence. As other courts have, the undersigned finds this indicates control over Plaintiffs. *See Schofield*, 2021 WL 533540, at *6 (finding control where the club

"exercised complete control over the flow of customers into the club"); *Butler*, 2013 WL 5964476, at *4 (same); *Reich v. Priba Corp.*, 890 F. Supp. 586, 592 (N.D. Tex. 1995) ("*Reich I*") (finding a similar arrangement indicated that dancers' "economic status is inextricably linked to those conditions over which defendants have complete control.").

Second, The Furnace's fee system indicates control. The Furnace requires each dancer to check in upon arrival and pay a fee to perform, escalating by how late in the evening the dancer arrived. Furthermore, The Furnace charged this fee not just when a dancer performed, but also when she missed a scheduled shift. Numerous courts have found this sign-in and fee system supports control over a purported employee. *See Schofield*, 2021 WL 533540, at *5; *McFeeley v. Jackson Street Ent., LLC*, 47 F. Supp. 3d 260, 268 (D. Md. 2014) ("*McFeely I*"); *Shaw v. Set Enterprises, Inc.*, 241 F. Supp. 3d 1318, 1325 (S.D. Fla. 2017).

Third, The Furnace's practice of setting minimum rates for dances indicates control.[16] While this is more probative of the second *Scantland* factor, the undersigned finds, as have other courts, that a nightclub's practice of limiting a dancer's discretion to vary downwards from a minimum rate is an indication of control. *See Schofield*, 2021 WL 533540, at *7; *Reich v. Circle C. Invs., Inc.*, 998 F.2d 324, 327 (5th Cir. 1993) ("*Reich II*").

---

[16] Defendants hint at, but do not actually establish, a dispute as to whether they set minimum prices. While declarations from Jenny Sartain and the Jane Doe dancers highlight that "entertainers have discretion to set their own personal dance and VIP fees" and that "different entertainers set different fees for their dances" (Doe Decls. at ¶ 44; Sartain Decl. at ¶ 10–12), this conspicuously fails to refute Scruggs's testimony concerning *base* prices for private dances. (Scruggs Depo. at 28:17–22, 30:14). Furthermore, Defendants' own characterization of the testimony it cites is that "[t]he entertainers were allowed to charge **above** suggested prices for private dances and VIP rooms . . . ." (Doc. 99 at 20) (emphasis added). In any case, even if these minimum rates were only recommended, "whether the club characterized the price of a dance as a minimum price or a recommended price, the bottom line is that the club influenced the pricing of the various performances offered." *Schofield*, 2021 WL 533540 (cleaned up and citation omitted).

18

The undersigned is also unpersuaded by the facts The Furnace highlights.   It is largely irrelevant that The Furnace's dancers may pursue other careers and work.   "The fact that dancers can work at other clubs [does] not distinguish them from countless workers . . . who are undeniably employees under the FLSA, for example, waiters, ushers, and bartenders–that may simply work for other businesses."  *McFeeley I*, 47 F. Supp. 3d at 272.  *See also Hurst v. Youngelson,* 354 F. Supp. 3d 1362, 1376 (N.D. Ga. 2019) ("Working at other clubs does not diminish Plaintiff's relationship with Follies. Many people are employed at two jobs.").   The dancers' ability to set their own schedules, come and go at their own convenience, and determine when, where, and for whom to dance on a given night all suggest The Furnace does not closely manage Plaintiffs, but not that it lacks control for the purposes of the FLSA.   The Furnace Rules, which are fairly detailed, support a greater degree of control over dancers' day-to-day conduct than this relative freedom might indicate.   Even if loosely enforced, "[a]n employer's 'potential power' to enforce its rules and manage dancers' conduct is a form of control."  *McFeeley v. Jackson St. Ent., LLC*, 825 F.3d 235, 242 (4th Cir. 2016) ("*McFeely II*").   Additionally, other courts have found this lack of close management to "merely mask the economic reality of dependence," *Reich I*, 890 F. Supp. at 592, in the face of other, greater indicia of control.   For example, the court in *Butler* determined that the defendant nightclub did not exert a great deal of control over the "day-to-day aspects of the dancers' performances" because it did not set "work schedules for the dancers, but rather permits them to work at other clubs and to 'come and go as they please' . . . did not mandate that Plaintiff dress or dance a certain way, did not limit the amount of lap dances she could perform, and did not limit the number of beverages a customer could purchase for her."  *Butler*, 2013 WL 5964476, at *3.  Nevertheless, the court found the control factor tipped in the plaintiff dancers' favor due to the defendant nightclub's "significant control over the atmosphere, clientele, and operation of the

club," which (as the undersigned has also found above) points to exclusive control of the flow of customers. *Id.* The undersigned finds *Butler* persuasive on this point and does not give this aspect of Plaintiffs' working relationship much weight. *See also Shaw* 241 F. Supp. 3d at 1325 (finding dancers' ability to "choose their shifts, clients, and which dances to perform" were part of the "discretion . . . typical for an exotic dancer" and thus affording it minimal weight).

Defendants cite several cases in which they say there was a dispute of material fact as to the control factor. (Doc. 99 at 19–20). Defendants' parenthetical explanations of at least one of these cases does not capture the whole story and is not persuasive. Defendants cite *Bally v. Dreams Cabaret, LLC*, 2018 WL 456029, (W.D. Tex. Jan. 16, 2018) as a case where the court found "no control in the absence of documentary evidence where the general manager's affidavit contradicted plaintiffs' testimony that defendants controlled their schedules, set minimum prices for stage performances, and otherwise controlled dancers' appearance and conduct on the floor." (Doc. 99 at 19). As to schedules, the general manager stated in his affidavit that the club "do[es] not impose 'any control whatsoever' on when a dancer shows up to the nightclub or whether a dancer shows up at all," "never fine[s] dancers for absences or tardiness," assesses "no penalty for not showing up to the nightclub," does not requires dancers "to provide any notice regarding whether they are going to show up that day, the next day, or any day," and has no shifts "because dancers show up whenever they choose . . . ." *Id.* at *5. As to minimum rates, the manager stated that customers are "free to pay as much as they choose for stage dances." *Id.* Here, taking the conflicting evidence in Defendants' favor, it is undisputed that The Furnace (1) fines dancers for tardiness, (2) assesses dancers who miss a shift the full fee they would have paid had they worked that shift, and (3) sets minimum prices for dances. In other words, the evidence as to scheduling and minimum prices indicating no great deal of control in *Bally* is materially different and thus distinguishable from the

evidence here.  In the remaining cases cited by Defendants, each court found there was not enough evidence to support control in light of disputed facts.  *See Kellogg v. Fannie's Inc.*, 467 F. Supp. 3d 1296, 1311 (N.D. Ga. 2020); *Herrera v. JK & HE Bus., LLC*, No. CV H-14–2986, 2016 WL 8193294, at *7 (S.D. Tex. Oct. 14, 2016); *Ebony v. Babe's S.*, 2015 U.S. Dist. LEXIS 199277, *8 (N.D. Fla. 2015).  Here, the undersigned has resolved all disputed facts in Defendants favor and concluded the undisputed facts nevertheless support The Furnace's control over dancers. Accordingly, this factor weighs in favor of employee status.

### 2. Opportunity for Profit and Loss

The second factor is "the alleged employee's opportunity for profit or loss depending upon [her] managerial skill."  *Scantland*, 721 F.3d at 1312.  This factor focuses on "the <u>worker's</u> contribution to managerial decision-making . . . <u>relative</u> to the company's." *McFeeley II*, 825 F.3d at 244 (emphasis in original).

Plaintiffs' evidence for this factor is the following: (1) dancers were not permitted to hire other dancers to work for them; (2) dancers have no managerial responsibilities and thus lack the ability to profit from their management of others; (3) dancers are entirely dependent upon Defendants' ability to attract customers and upon Defendants' providing a building in which to work; and (4) Defendants set the prices Plaintiffs could charge customers for dances.  (Doc. 95-1 at 31).  Defendants counter by pointing to evidence that dancers were able to charge above suggested prices for private dances, marketed themselves to customers, and earned money through getting customers to The Furnace.[17]  (Doc. 99 at 20).

---

[17] Defendants also state Jeronymo "utilized her alleged profit and loss to obtain a PPP loan to support her ongoing operation."  (Doc. 99 at 20).  It is uncontroversial and undisputed that

While the evidence Defendants cite does indicate that dancers had more control over pricing and attracting customers than Plaintiffs originally indicated, as Plaintiffs point out, Defendants' argument are essentially that Plaintiffs can "hustle" to earn more income for themselves. (*See* doc. 95-1 at 32; doc. 107 at 7). None of this is indicative of *managerial* skill, and courts have "almost universally rejected" this argument. *Shaw*, 241 F. Supp. 3d at 1325. The remaining facts overlap with facts discussed above in the context of the first *Scantland* factor. As in the control context, "courts have routinely held that 'where the clubs are primarily responsible for drawing customers to the club and set minimum fees for services, the clubs [ ] exercise significant control over the dancers' opportunity for profit.'" *Schofield*, 2021 WL 533540 at *7 (quoting *Reich II*, 998 F.2d at 324). Specifically, while dancers might have the opportunity to convince potential customers to come to The Furnace, dancers are completely reliant on The Furnace to admit those potential customers into facilities it alone controls, during hours it chooses to operate. This suggests the opportunity for profit and loss lies predominately with The Furnace rather than dancers. *See Reich I*, 890 F. Supp. at 593 (weighing this factor against a defendant nightclub where it "hours of operation, sets the atmosphere, and coordinates advertising").[18] And The Furnace's minimum prices lessen the ability of a dancer to negotiate prices with a customer.

As with the control factor, this factor supports that Plaintiffs are employees of The Furnace.

---

dancers experience profit and loss from their work. The question here is the relative opportunity for profit and loss, of which the PPP application is not probative.

[18] Somewhat distinguishing this case from *Reich I*, there is little evidence of The Furnace's advertising in this case beyond the existence of its website. That said, the undersigned does not find that absence particularly meaningful in light of other evidence related to The Furnace's maintenance and control of its facilities.

### 3. Investment in Equipment and Materials

This factor considers "the alleged employee's investment in equipment or materials required for [her] task." *Scantland*, 721 F.3d at 1312.  As with the second factor, the analysis focuses on "the worker's . . . investment relative to the company's." *McFeeley II*, 825 F.3d at 244 (emphasis in original).

Plaintiffs contend this factor greatly weighs in their favor.  In support, they highlight the following: (1) the $36,000 paid to rent space to operate The Furnace; (2) the purchase of The Furnace's stages and poles for the stages; (3) Defendants' ownership of the PA system used by the DJs; (4) Plaintiffs do not pay Defendants' utility bills or insurance premiums; (5) Defendants pay the ASCAP fees for the rights to play music at The Furnace; and (6) Defendants control the content of the music played while customers are present and Plaintiffs are working.  (Doc. 95-1 at 32–33). Defendants point to "substantial amounts" that Plaintiffs have invested, including cosmetic procedures for Mastropolo totaling $4,335 and a practice pole purchased by Jeronymo for her home.  (Doc. 99 at 21).  Defendants also attempt to connect the approximately $21,000.00 per month in fees paid by the dancers to the $36,000.00 rent paid by The Furnace.[19]  (Doc. 99 at 21).

---

[19] Defendants note that some dancers noted the fee expenses on their taxes and contend that evidence from Plaintiffs' allegedly missing tax returns and other evidence would provide additional support for their investment in The Furnace.  (Doc. 99 at 21).  Defendants have attached to their motion a declaration from counsel pursuant to Fed. R. Civ. P. 56(d) asserting that they are "unable to provide key and additional facts as discovery is still pending in this matter . . . ." (Doc. 99-13).  In that declaration, counsel recounts a variety of discovery matters that have been brought before the court concerning Plaintiffs' tax returns, as well as supplementation from new plaintiffs recently added to this case.  (*Id.*).  And in their response to the motion for summary judgment, Defendants argue this absence of evidence results in prejudice to Defendants requiring the court to deny the motion or adopt a negative inference as to what the tax returns would have shown. (Doc. 99 at 23).

Accepting that the expenditures Defendants highlight are investments in equipment and materials by Plaintiffs, the bulk of the investments here were made by The Furnace.  The Furnace operates a nightclub, which represents an "obvious significant investment."  *Reich II*, 998 F.2d at 328 (5th Cir. 1993).  The monthly rent for the facilities alone dwarfs any realistic expenditures a

---

Under Fed. R. Civ. P. 52(d)(2), the court may permit additional discovery "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition" to a motion for summary judgment.  The Eleventh Circuit has explained that to obtain relief pursuant to Rule 56(d), a party must "set [] forth with particularity the facts the moving party expects to discover and how those facts would create a genuine issue of material fact precluding summary judgment." *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1280 (11th Cir. 1998). It is not sufficient for the party seeking the delay to rely on vague assertions that additional discovery will produce needed, but unspecified, facts. *Reflectone, Inc. v. Farrand Optical Co.*, 862 F.2d 841, 843 (11th Cir. 1989). Additionally, a party is not entitled to conduct further discovery under Rule 56(d) where the absence of evidence is the result of that party's lack of diligence in pursuing such evidence through permitted sources outside The Furnace. *Barfield v. Brieton*, 883 F.2d 923,932(11th Cir. 1989) (finding that no additional discovery should be granted when the absence of information was due to the plaintiff's lack of diligence); *see also Fla. Power & Light Co. v. Allis Chalmers Corp.*, 893 F.3d 1313, 1316 (11th Cir. 1990) (affirming the district court's denial of a Rule 56(d) motion where the parties agreed on a discovery schedule which the trial court extended several times).

The undersigned agrees that the evidence Defendants cite has some relevance to this case. Specifically, the evidence might show that additional Plaintiffs deducted expenses related to dancing from their taxes and received income from sources outside The Furnace. However, this evidence is hardly essential for Defendants to oppose the motion for summary judgment. The inference that dancers in general often worked at other locations is supported by the declarations of the Jane Doe dancers and other evidence in the record. And Defendants already possess tax returns showing some deductions for dancing-related expenses, supporting the inference that other dancers deduct such expenses as well. In short, whatever evidence might be obtained from other Plaintiffs' tax returns appears to be cumulative of evidence in the record and unnecessary to support the inferences Defendants desire.

In any case, regardless of whether the evidence is actually essential, Defendants' request for denial of the motion for summary judgment based on missing discovery is **DENIED**. As reflected in counsel's declaration, Defendants have known about this dispute since at least June 2022. While the undersigned appreciates that the parties initially attempted to resolve the issue with minimum court involvement, relief under Rule 56(d) is not appropriate when Defendants never availed themselves of the opportunity to compel the production of the evidence they say is missing—even after Plaintiffs moved for summary judgment the issue was still being discussed between the parties. This is particularly true when Plaintiffs contend they *have* produced all evidence within their custody and control, including all tax returns that exist. (Doc. 107 at 8).

24

dancer might have for equipment and materials related to her work, to say nothing of insurance, ASCAP fees, the PA system, and stages. As for Defendants' attempt to tie the rent to the dancers' fees, apart from being able to perform at the club, there is no evidence to support that dancers derive any material benefit from paying fees to the club, such as an ownership interest in The Furnace or any of its fixtures. Whatever relationship exists between these two amounts appears to be a product of accounting rather than investment. The undersigned agrees that this factor points heavily towards employee status.

### 4. Special Skill Required

The fourth factor concerns "whether the service rendered requires a special skill." *Scantland*, 721 F.3d at 1312. As to this factor, Plaintiffs point to evidence that The Furnace does not require dancers to have any formal education, training, or certification in dance, and that The Furnace highlights dancers' attractiveness rather than any particular skill they might have. (Doc. 95-1 at 34). Defendants admit that no special skill is required of the dancers. (Doc. 99 at 23). The undersigned concludes this factor weighs in favor of an employment relationship.

### 5. Permanency and Duration of Working Relationship

The next factor is "the degree of permanency and duration of the working relationship." *Scantland*, 721 F.3d at 1312.

As to this factor, Plaintiffs note that relationships with a club extending over a year can signify permanence. (Doc. 95-1 at 35) (citing *Clincy v. Galardi S. Enterprises, Inc.*, 808 F. Supp. 2d 1326, 1348 (N.D. Ga. 2011)). According to Plaintiffs, some dancers worked at The Furnace for years. Defendants observe that dancers can "come and go, quit and come back or just work for specific reasons, a new car, to get a down payment for a house, vacation, etc. as well as other jobs." (Doc. 99 at 23). They also provide context for Plaintiffs' claim that dancers worked for years at

The Furnace, noting that some "would work for a time period, take months off and then work again." (*Id.* at 24).

This factor is a bit of a mixed bag.  There is no fixed end date or temporal limitation on dancers' employment with The Furnace.  Even if dancers may leave periodically and return, this does not suggest that they work at The Furnace on a project-by-project basis.  *See Hobbs v. Petroplex Pipe & Constr., Inc.*, 946 F.3d 824, 834 (5th Cir. 2020) (finding lack of evidence of project-by-project work supported employee status).  And dancers' work at other clubs in addition to The Furnace does not appear meaningfully different than any other employee working multiple jobs.  That said, even if Plaintiffs are correct about how long they have worked at The Furnace from first performance to last performance, Defendants have produced evidence showing that this does not tell the full story; many dancers work sporadically at The Furnace and take significant periods of time away without any readily apparent explanation.  (*See* Sartain Decl. at ¶ 3).  On the whole, the undersigned finds this factor weighs weakly against employee status.  That said, courts have generally placed little emphasis on this factor in the exotic dancer context because exotic dancers tend to be "transient or itinerant."  *See Harrell v. Diamond A Ent., Inc.,* 992 F. Supp. 1343, 1352 (M.D. Fla. 1997); *Clincy*, 808 F. Supp. 2d at 1348.  The undersigned agrees that this factor is not entitled to as much weight as others.

### 6. Integral Part of Alleged Employer's Business

The final factor considers "the extent to which the service rendered is an integral part of the alleged employer's business."  *Scantland*, 721 F.3d at 1312.  Defendants concede that the dancers are an integral part of The Furnace's business.  (Doc. 99 at 24).  Therefore, this factor weighs in favor of employee status.

**7. Other Considerations**

In addition to the *Scantland* factors, The Furnace points to what it contends is a "specific and apparently unique, local ordinance passed by the City of Birmingham requiring each entertainer to possess not only a Dancer's Permit, but also her own Business License," which it contends "should be considered with the 'economic reality" factors" in assessing the parties' employment relationship (or lack of one). (Doc. 99 at 16–17).   That ordinance reads in full:

> **DANCERS/PERFORMERS (Division IV Dancing) IN AN ESTABLISHMENT SERVING ALCOHOL** must obtain the proper Police Department permit *and a valid business license* (Division IV Dancing) *before* dancing or performing. The establishment in which the applicant will dance or perform *must be a licensed Division II adult establishment*. Contact Officer Fred Patterson at (205) 254–6416, or the Tax and License Administration Division at (205) 254–2198 for more information.

(Doc. 99 at 16) (citing https://www.birminghamal.gov/wp-content/uploads/2017/08/General-Information-for-New-Businesses.pdf) (emphasis added by Defendants).

A requirement by the City of Birmingham that a dancer obtain a business license says nothing about the relationship between the dancer and The Furnace.  Defendants state that "if the entertainers do not possess a business license and they entertain at The Furnace, the reality is that the entertainers could be arrested and the club shut down" (doc. 99 at 16), but they provide no justification for their implicit argument that paying dancers as employees would cause them to violate this ordinance.  Furthermore, the City itself denies any relationship between this ordinance and independent contractor status.  (Doc. 95-30 at ¶¶ 5, 7–8).  The undersigned accords this requirement no weight in determining whether Plaintiffs are employees.

**8. Balance of Factors**

Taking the *Scantland* factors together, and mindful of the fact that "[w]hen a disposition in either direction can be justified, the Court must err in favor of a broader reading of 'employee,'"

27

*Hanson v. Trop, Inc.*, 167 F. Supp. 3d 1324, 1328 (N.D. Ga. 2016) (citing *Usery v. Pilgrim Equip. Co.*, 527 F.2d 1308, 1311 (5th Cir. 1976)),[20] the undersigned concludes that the economic reality is that Plaintiffs are employees of The Furnace. With the exception of the permanency and duration factor, each of the factors weighs in favor of a finding that Plaintiffs are employees. Like other courts considering the issue, the undersigned declines to give the permanency and duration factor much weight in the analysis. There are some factual disputes within some of the remaining factors, particularly the control factor; even accepting Defendants' version of these facts, each of those factors still points towards a finding of employee status.[21] The question is closer than Plaintiffs would have it, but it is also not unanswerable at summary judgment, as Defendants argue. In other words, this is not a case where the factors fail to "provide a definitive answer regarding [Plaintiffs'] employee status." (Doc. 99 at 25) (quoting *Jones v. Pawar Bros. Corp.*, 434 F. Supp. 3d 14, 26 (E.D.N.Y. Jan. 22, 2020)). A reasonable jury could not find on this record that Plaintiffs are independent contractors of The Furnace. Therefore, Plaintiffs' motion for summary judgment is due to be granted as to this issue.

---

[20] The decisions of the former Fifth Circuit handed down before October 1, 1981, are binding in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

[21] Defendants contend that the court "should not weigh what are disputed issues of material fact in this case, but instead, it should be up to a jury to determine the true economic reality." (Doc. 99 at 24). The presence of disputed facts alone is not enough to deny summary judgment. Although there are some competing facts, the undersigned has resolved all genuine factual disputes in Defendants' favor for the purposes of this motion. In other words, the undersigned is not weighing the *evidence* to resolve factual disputes, but weighing the *facts* under the applicable legal standard.

### B. Graham Jackson's Status as Employer

Plaintiffs next contend they are entitled to summary judgment as to whether Graham Jackson is an employer under the FLSA. The FLSA holds liable any "employer" who violates minimum-wage or overtime provisions. 29 U.S.C. § 216(b). Under the FLSA, an "employer" is broadly defined and includes "both the employer for whom the employee directly works as well as 'any person acting directly or indirectly in the interests of an employer in relation to an employee.'" *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1298 (11th Cir. 2011) (citing 29 U.S.C. § 203(d)). Based on this definition, the Eleventh Circuit has held that "a covered employee may file suit directly against an employer that fails to pay him the statutory wage, or may make a derivative claim against any person who (1) acts on behalf of that employer and (2) asserts control over conditions of the employee's employment." *Id.* (citation omitted).

"A corporate officer with operational control of a corporation's covered enterprise is an employer along with the corporation, jointly and severally liable under the FLSA for unpaid wages." *Patel v. Wargo*, 803 F.2d 632, 637–38 (11th Cir. 1986) (citation omitted). There is no requirement that the individual employee be named a "corporate officer," and whether an individual fits that definition "does not depend on technical or isolated factors but rather on the circumstances of the whole activity." *Lamonica v. Safe Hurricane Shutters, Inc.*, 711 F.3d 1299, 1301 (11th Cir. 2013).

Plaintiffs contend Graham Jackson is their employer based on the following evidence: Graham is the primary manager of The Furnace; Graham has final say on rules for the club except as to Gregory; Gregory consults with Graham on important business decisions; manager Bermudez reports to Graham as his direct boss; manager Scruggs reports to Graham as the operations manager; Graham set the house fee system and wrote The Furnace Rules; Graham made

29

suspension decisions; Graham set the policy charging late fees; Graham and Gregory determined The Furnace's hours; and Graham set the base prices for private dances and VIP room dances. (Doc. 95-1 at 38–39).  Faced with these strong indicia of operational control, Defendants contend only that genuine issues of material fact concerning Plaintiffs' classification ought to also preclude summary judgment on whether Graham is an employer.  (Doc. 99 at 25).

As discussed above, the undersigned has determined that Plaintiffs are entitled to summary judgment on the classification issue.  Consequently, there is no reason to defer determining whether Graham is an employer under the FLSA.  There is no genuine issue of material fact as to this question, based on the facts Plaintiffs have identified and Defendants' failure to point to any countervailing facts: he is.  Therefore, Plaintiffs are entitled to summary judgment on this issue as well.

### C. Good Faith Defense

Next, Plaintiffs move for summary judgment as to Defendants' affirmative defenses of good faith under 29 U.S.C. §§ 259 and 260.  (Doc. 95-1 at 40–43).  This appears to attack Paragraph 28 of the affirmative defenses Defendants list in their answer to the amended complaint.[22]  (Doc. 30 at 23, ¶ 28).

### 1. Section 259 Good Faith

Under § 259, an employer may avoid liability for minimum wage or overtime compensation violations by demonstrating that "the act or omission complained of was in good faith in conformity with and in reliance on any written administrative regulation, order, ruling,

---

[22] This defense states: "To the extent Defendant has acted in good faith compliance with the FLSA, and has had reasonable grounds for believing it is in compliance with the FLSA, the Plaintiffs are not entitled to a recovery."  (Doc. 30 at 23, ¶ 28).

approval, or interpretation, of the agency of the United States specified in subsection (b) of this section, or any administrative practice or enforcement policy of such agency with respect to the class of employers to which he belonged."  29 U.S.C. § 259(a).  This is an objective test that requires an employer to demonstrate that the action was (1) taken in good faith and was (2) in conformity with and (3) in reliance on a written administrative interpretation by a designated agency.

It is arguable that Defendants intend, in paragraph 28,to assert a good faith defense based on § 259 at all, but in any case they cannot.  Defendants do not specifically contend this applies to § 259, but they state that they have "posted the Fair Labor Standards Laws and followed the local laws of the City of Birmingham regarding entertainers being required to obtain permits and licensing, including dancing permits and the apparently unique requirement that the entertainers also must acquire a Business Licenses (Division IV Dancing) before dancing or performing." (Doc. 99 at 25–26).  However, Defendants do not contend that they relied on or acted in conformity with a written administrative interpretation by the agency designated to provide FLSA interpretations: the Administrator of the Wage and Hour Division of the Department of Labor.  *See* 29 U.S.C. § 259; *Cole v. Farm Fresh Poultry, Inc.,* 824 F.2d 923, 926 (11th Cir. 1987). Accordingly, Plaintiffs are entitled to summary judgment on this issue.

### 2. Section 260 Good Faith

While § 259 provides a defense to liability, § 260 provides a shield only to the potential imposition of liquidated damages.  Under § 260, "if the employer shows to the satisfaction of the court that the act or omission giving rise to [the FLSA] action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the [FLSA], the court may, in its sound discretion, award no liquidated damages or award any amount thereof."

To establish this defense, an employer must show both objective and subjective good faith.  *See Davila v. Menendez*, 717 F.3d 1179, 1186 (11th Cir. 2013).  To show subjective good faith, an employer must point to evidence of "an honest intention to ascertain what the Act requires and to act in accordance with it."  *Id.*  To show objective good faith, an employer must show "reasonable grounds for believing its conduct comported with the FLSA."  *Smith v. Wynfield Dev. Co.*, 451 F. Supp. 2d 1327, 1337 (N.D. Ga. 2006).

In their motion for summary judgment, Plaintiffs note that Defendants do not appear to have taken any steps to investigate the proprietary of classifying dancers as independent contractors since approximately 1999, undermining subjective good faith.  (Doc. 95-1 at 43).  They add that this also shows Defendants' lack of objective good faith, since "they would have known there have been considerable developments in the law regarding the status and compensation of exotic dancers under the FLSA" had they attempted to ascertain what the FLSA requires.  (*Id.*).  As noted above, Defendants point to the fact that they posted FLSA laws and followed the City of Birmingham's ordinance.  (Doc. 99 at 25–26).  Defendants also highlight that they "consulted an attorney and the City of Birmingham at the time they were opening the Club and received advice that they were in compliance with employment law."  (*Id.* at 26).  Defendants state this is evidence that their violation was not willful and that "the two year — and not the three year — statute of limitations should be applied."  (*Id.* at 26–27).

The first problem for Defendants is that the issue here is good faith, not willfulness.  While these two concepts have some degree of overlap, good faith is a question of law for the court, *see Chao v. Tyson Foods, Inc.*, 2008 WL 11376599 at *1 (N.D. Ala. 2008), while willfulness is a question for the jury, *see Alvarez Perez v. Sanford-Orlando Kennel Club, Inc.*, 515 F.3d 1150, 1163 n.3 (11th Cir. 2008).  And because the good faith and willfulness inquiries involve different

standards,[23] the cases Defendants cite for their lack of a willful FLSA violation are inapposite. That said, the undersigned will assess Defendants' arguments in the good faith context.

The undersigned agrees with Plaintiffs that Defendants actions show neither a subjective nor an objective good faith attempt to comply with the FLSA.  First, it is entirely unclear where, when, or how Defendants "posted the Fair Labor Standards Laws," nor specifically what "laws" Defendants "posted."  Second, to the extent that Defendants rely on the advice of the City of Birmingham, the City has expressly disclaimed giving any sort of advice about FLSA compliance, nor would it be objectively reasonable for an employer to rely on a municipal government for such advice.  Third, while Defendants state that they consulted with an attorney more than two decades ago, there is no indication what advice the attorney they consulted provided to them.  *See Townley v. Floyd & Beasley Transfer Co*., 1989 WL 205342 at *4 (N.D. Ala. 1989) ("[T]o reap the benefit of the good faith defense . . . based on the advice of counsel the defendant must honestly and truly seek the advice of counsel, counsel must give advice that is reasonable in a legal sense, and the defendant must strictly conform with that advice.").

Because Defendants have not shown a genuine dispute of material fact as to their good faith defense, the undersigned concludes Plaintiffs are entitled to summary judgment on that issue.

---

[23] As noted in Defendants' response, a finding of willfulness expands the period under which a plaintiff can recover for an FLSA violation.  "To establish that the violation of the [FLSA] was willful in order to extend the limitations period, the employee must prove by a preponderance of the evidence that his employer either knew that its conduct was prohibited by the statute or showed reckless disregard about whether it was." *Alvarez Perez v. Sanford-Orlando Kennel Club, Inc.*, 515 F.3d 1150, 1162–63 (11th Cir. 2008) (citing *McLaughlin*, 486 U.S. at 133).  "Reckless disregard" is defined as an employer's "failure to make adequate inquiry into whether [its] conduct is in compliance with the [FLSA]."  5 C.F.R. § 551.104.  "In other words, an employer does not commit a willful violation if it 'acts unreasonably, but not recklessly, in determining his legal obligation' under the act." *Davila v. Menendez,* 717 F.3d 1179, 1185 (11th Cir. 2013).

### D. Offset Defense

Finally, Plaintiffs have moved for summary judgment on Defendants' twentieth affirmative defense, which asserts that Defendants are "entitled to any and all offsets and/or set offs, credits and/or deductions permissible by law, including, but not limited to, an offsets of performance fees received by plaintiff, and not returns to defendants by plaintiffs."  (Doc. 95-1 at 44) (citing doc. 30 at 23, ¶ 20).  Plaintiffs interpret this section as an attempt by Defendants to offset any payment owed under the FLSA with payments made directly by customers to Plaintiffs.  (*Id.*).  Appearing to confirm this interpretation, Defendants contend there is a genuine dispute of material fact as to whether VIP room fees are service charges and thus as to whether the offset defense applies.  (Doc. 99 at 27–28).

The relevant regulations define a "tip" as "a sum presented by a customer as a gift or gratuity in recognition of some service performed for him." 29 C.F.R. § 531.53.  Conversely, "[s]ervice charges and other similar sums which become part of the employer's gross receipts are not tips for the purposes of the Act" and "[w]here such sums are distributed by the employer to its employees . . . they may be used in their entirety to satisfy the monetary requirements of the [FLSA]." 29 C.F.R. § 531.55(b).  In other words, for a fee to constitute a "service charge," it must be (1) recorded in a company's gross receipts, and (2) distributed by the company to the employee. *Henderson v. 1400 Northside Drive, Inc.*, 110 F. Supp. 3d 1318, 1322 (N.D. Ga. 2015).

Both parties claim this case is similar to the situation the Eleventh Circuit confronted in *Compere v. Nusret Miami, LLC*, 28 F.4th 1180 (11th Cir. 2022).  In that case, an upscale steakhouse appended an 18% service charge to customers' bills. *Id.* at 1181.  It then "collected these payments and redistributed them to certain employees on a pro rata basis to cover [its]

34

minimum and overtime wage obligations." *Id.*  The Eleventh Circuit held this was a service fee entitling the defendants to an offset, rather than a tip.  *Id.* at 1186.

Defendants contend that the VIP room fees The Furnace charges become part of its gross receipts because it lists them on its income statement.  (Doc. 99 at 28) (citing Defendants' Exh. 30 Bates 03105; Defendants' Exh. 31 Bates 03108).[24]  Assuming this suffices for the first element of the service charge inquiry, it is undisputed that Defendants cannot satisfy the second element because they did not distribute those fees to Plaintiffs or to any other dancers; instead, dancers were paid directly by customers.[25]  The Eleventh Circuit *expressly distinguished* cases involving "clubs where customers paid fees, in cash, as well as tips, directly to dancers" from the situation in *Compere*, where "the service charges paid by [the defendant's] customers never went directly to employees, but went directly to [the defendant] through its POS system."  *Compere*, 28 F.4th at 1188, n.13 (11th Cir. 2022).  In other words, the critical issue in this case as to the offset defense was not at issue in *Compere*.

Plaintiffs have established that there is no genuine issue of material fact as to Defendants' offset defense.  Therefore, they are entitled to summary judgment on that issue.

---

[24] Both cited exhibits are part of the material Defendants include in their motion to seal. They will be docketed under seal concurrently with this memorandum opinion.

[25] Defendants contend that the undersigned "need not address [the offset] argument as Plaintiffs failed to reference any part of the record to support any argument related to the above cases."  (Doc. 99 at 27-28).  It is clear from Plaintiffs' statement of undisputed facts that dancers are paid by customers and not The Furnace.  It is not necessary under these circumstances that Plaintiffs refer back to these facts in the argument section of their brief.

### IV. Conclusion

For the reasons stated above, Plaintiffs' motion for partial summary judgment is **GRANTED** as to all Plaintiffs other than Campbell.  Those Plaintiffs are entitled to partial summary judgment as follows:

- Plaintiffs were misclassified as independent contractors and are employees under the FLSA;

- Graham Jackson is Plaintiffs' employer under the FLSA;

- Defendants may not assert a good faith affirmative defense under 29 U.S.C. §§ 259 or 260; and

- Defendants may not assert an offset affirmative defense.

The undersigned withholds ruling on the motion for summary judgment as it pertains to Campbell.  Plaintiffs may supplement the motion for summary judgment by **September 20, 2023** with proof that Campbell worked at The Furnace during the relevant time period.  If Plaintiffs do so, the undersigned will grant their motion as to Campbell.

A telephone status conference is **SET** for **October 2, 2023**, at **11:00 a.m.**  The parties should be prepared to discuss next steps for this case, including whether they believe magistrate-judge-led mediation would be beneficial. The parties are **DIRECTED** to call **205-931-0422** to access the telephone conference.  The conference ID is **888 998 235**.  The parties should call in five minutes prior to the start time of the conference.

DONE this 13th day of September, 2023.

_____
**JOHN H. ENGLAND, III**
UNITED STATES MAGISTRATE JUDGE